Index No. 17-CV-08593 (JPO)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KENYA THOMAS, TYANA MILLER,

Plaintiffs,

-against-

THE CITY OF NEW YORK, POLICE OFFICER
BRIDGET PENNER, POLICE OFFICER ANDREW
KAMNA, SERGEANT DAVID CHESEWRIGHT,
POLICE OFFICER LEONARD CLARKE and JANE
DOE,

Defendants.

**DEFENDANTS' MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT AND DISMISSAL**

**GEORGIA M. PESTANA**
Acting Corporation Counsel
of the City of New York
Attorney for Defendants
100 Church Street
New York, New York 10007

Of Counsel:  Lucienne Pierre
Tel:  (212) 356-2415

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ......................................................................................................... 2

STANDARD OF REVIEW ........................................................................................................ 2

ARGUMENT

    POINT I

        PLAINTIFFS' FEDERAL CLAIM FOR "ILLEGAL SEARCH" FAILS ...................................................... 3

        Search Warrant............................................................................................ 3

        Search of Apartment 6C............................................................................. 5

        Property....................................................................................................... 7

    POINT II

        THE INDIVIDUAL MALE DEFENDANTS SHOULD BE DISMISSED BECAUSE PLAINTIFFS CANNOT PROVE PERSONAL INVOLVEMENT ................................................................. 8

        Police Officer Leonard Clarke ................................................................... 9

        Sergeant David Chesewright........................................................................ 11

        Police Officer Andrew Kamna................................................................... 13

    POINT III

        THE INDIVIDUAL MALE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY............................................. 15

    POINT IV

        PLAINTIFFS' ILLEGAL STRIP SEARCH/BODY CAVITY SEARCH CLAIMS FAIL......................................................... 16

**Page**

Plaintiff Thomas' Allegations of Illegal Strip Search
/ Body Cavity Search .......................................................................... 17

Plaintiff Miller's Allegations of Illegal Strip Search
/ Body Cavity Search ....................................................................... 21

POINT V

PLAINTIFFS' STATE LAW SEXUAL ASSAULT
AND BATTERY CLAIMS FAIL ............................................................ 24

POINT VI

PLAINTIFFS' MONELL CLAIM FAILS ............................................... 25

CONCLUSION .................................................................................................. 26

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                         **<u>Pages</u>**

<u>Allen v. Murray – Lazarus</u>,
   463 F. App'x 14 (2d Cir. 2012) ...............................................................................3

<u>Anderson v. Liberty Lobby, Inc.</u>,
   477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)...........................................2

<u>Burke v. Cicero Police Dep't</u>,
   2010 WL 1235411, 2010 U.S. Dist. LEXIS 31414 (N.D.N.Y. 2010) ....................................21

<u>Cantave v. New York City Police Officers</u>,
   No. 09-CV-2226 (CBA) (LB), 2011 U.S. Dist. LEXIS 34231, 2011 WL
   1239895 (E.D.N.Y. Mar. 28, 2011) .......................................................................7

<u>Castro v. Cnty. of Nassau</u>,
   739 F. Supp. 2d 153 (E.D.N.Y. 2010) ....................................................................2

<u>Celotex Corp. v. Catrett</u>,
   477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)...........................................3

<u>Chunyu Jean Wang v. Vahldieck</u>,
   No. 09-CV-3783 (ARR) (VVP), 2012 WL 92423, 2012 U.S. Dist. LEXIS
   3763 (E.D.N.Y. Jan. 9, 2012) ...............................................................................21

<u>Cox v. City of New York</u>,
   No. 13-CV-163, 2014 WL 3696003, 2014 U.S. Dist. LEXIS 100552
   (E.D.N.Y. July 22, 2014) .......................................................................................7

<u>Esperanza v. City of New York</u>,
   325 F. Supp. 3d 288 (E.D.N.Y. 2018) ....................................................................7

<u>Flanigan v. General Elec. Co.</u>,
   242 F.3d 78 (2d Cir. 2001)......................................................................................2

<u>Fleurimond v. Holder</u>,
   No. 16-CV-750 (PKC) (ST), 2019 WL 3975004, 2019 U.S. Dist. LEXIS
   142140 (E.D.N.Y. Aug. 21, 2019) ........................................................................15

<u>Franks v. Delaware</u>,
   438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).........................................3, 4

<u>Frederick v. City of New York</u>,
   No. 13-CV-897 (MKB), 2013 U.S. Dist. LEXIS 58166, 2013 WL 1753063
   (E.D.N.Y. Apr. 22, 2013)......................................................................................11

**Cases**                                                                          **Pages**

Gonzalez v. City of Schenectady,
    728 F.3d 149 (2d Cir. 2013)................................................................16, 19, 20, 23

Illinois v. Gates,
    462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)..........................................4

Jaramillo v. Weyerhaeuser Co.,
    536 F.3d 140 (2d Cir. 2008)...............................................................................3

Liranzo v. City of New York,
    2012 U.S. Dist. LEXIS 178872 (S.D.N.Y. Dec. 11, 2012) ....................................8

Monell v. Dep't of Soc. Servs.,
    436 U.S. 658 ................................................................................................25

People v. Hall,
    10 N.Y.3d 303, 886 N.E.2d 162, 856 N.Y.S.2d 540 (2008)...................................16

Powell v. Nat'l Bd. Of Med. Examiners,
    364 F. 3d 79 (2d Cir. 2004)................................................................................3

Rojas v. Roman Catholic Diocese of Rochester,
    660 F.3d 98 (2d Cir. 2011)................................................................................2

Scalpi v. Amorim,
    No. 14-CV-2126 (KMK), 2018 U.S. Dist. LEXIS 53420
    (S.D.N.Y. Mar. 29, 2018) ................................................................................20

Smith v. City of New York,
    2010 WL 3397683, 2010 U.S. Dist. LEXIS 88774 (S.D.N.Y. Aug. 27, 2010).......................16

Taylor v. Brentwood Union Free Sch. Dist.,
    143 F.3d 679 (2d Cir. 1998)..............................................................................8

Tooly v. Schwaller,
    919 F.3d 165 (2d Cir. 2019)..............................................................................15

United States v. Awadallah,
    349 F.3d 42 (2d Cir. 2003)..............................................................................3, 5

United States v. Falso,
    544 F.3d 110 (2d Cir. 2008)...............................................................................4

United States v. Klump,
    536 F.3d 113 (2d Cir. 2008)............................................................................3, 4

**Cases**                                                                                      **Pages**

Velardi v. Walsh,
    40 F.3d 569 (2d Cir. 1994).......................................................................................................4

Williams v. Smith,
    781 F.2d 319 (2d Cir. 1986),
    cert. denied, 434 U.S. 1087, 98 S. Ct. 1282, 55 L. Ed. 2d 792 (1978) .....................................8

Wright v. City of Waterbury,
    3:07-cv-306, 2011 WL 1106217, 2011 U.S. Dist. LEXIS 29666
    (D. Conn. 2011) .....................................................................................................................21

**Statutes**

42 U.S.C. § 1983..........................................................................................................3, 7, 8, 16, 20

Fed. R. Civ. P. 56.......................................................................................................................2

Fed. R. Civ. P. 56(c)(1)(B) .......................................................................................................2

Local Civil Rule 56.1 ................................................................................................................2

## PRELIMINARY STATEMENT

On February 2, 2017, at approximately 9 am, there were two different search warrants executed at two different apartments in a building located at 60 Moore Street, Brooklyn, New York. One search warrant was executed by members of the NYPD's Borough Brooklyn North, and the other search warrant was executed by PSA-3. This lawsuit concerns the Borough Brooklyn North search warrant, which was executed at 60 Moore Street, Apt. 6C.

The Borough Brooklyn North team was all male, and included, among others, Police Officer Andrew Kamna, Sergeant David Cheesewright, and Police Officer Leonard Clarke. Upon entering Apartment 6C, members of Brooklyn North discovered that there were women inside of the apartment. A male officer on the Brooklyn North team requested, over the radio, the assistance of a female officer, to search the women inside of the apartment.[1] Officer Bridget Penner, assigned to the PSA-3 team that day, and in the vicinity in relation to the PSA-3 search warrant in the same building, was ordered to go help out the Borough Brooklyn North team with searching women in Apartment 6C. Officer Penner complied with the order, and searched two women inside of Apartment 6C, before resuming her duties with PSA-3.

Plaintiffs Kenya Thomas and Tyanna Miller, two of the women inside of 60 Moore Street, Apt. 6C on February 2, 2019, now sue, alleging that the searches conducted of the apartment and of their persons violated their constitutional rights. For the reasons set forth below, defendants City Of New York, Police Officer Bridget Penner, Police Officer Andrew Kamna, Sergeant David Cheesewright, and Police Officer Leonard Clarke ("Defendants") are entitled to summary judgment on plaintiffs' claims.

---

[1] See Muehler v. Mena, 544 U.S. 93, 102, 125 S. Ct. 1465, 1472 (2005) (officers may detain and handcuff occupants during execution of a search warrant).

## STATEMENT OF FACTS

For a complete statement of the relevant and undisputed facts, the Court is respectfully referred to Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1, dated September 6, 2019 ("Def. 56.1").

## STANDARD OF REVIEW

Defendants are entitled to summary judgment as it shall be granted to a movant who demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law.'" Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). No genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted).

The movant carries the burden of demonstrating the absence of a material fact issue. Rojas, 660 F.3d at 104. The court must construe the facts in the light most favorable to the nonmoving party and resolve all reasonable inferences and ambiguities against the moving party. Flanigan v. General Elec. Co., 242 F.3d 78, 83 (2d Cir. 2001). A moving party may indicate the absence of a factual dispute by, inter alia, "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). Once the moving party has met its burden, "the nonmoving party may not rest upon mere conclusory allegations or denials." Castro v. Cnty. of Nassau, 739 F. Supp. 2d 153, 165 (E.D.N.Y. 2010) (internal citations and quotation marks omitted). Rather, "the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).  "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  Allen v. Murray – Lazarus, 463 F. App'x 14, 16 (2d Cir. 2012).  Furthermore, "the existence of a mere scintilla of evidence in support of nonmovant's position is insufficient to defeat the motion."  Powell v. Nat'l Bd. Of Med. Examiners, 364 F. 3d 79, 84 (2d Cir. 2004).   Here, summary judgment should be granted in favor of defendants as there are no genuine issues of material fact.

## ARGUMENT

### POINT I

### PLAINTIFFS' FEDERAL CLAIM FOR "ILLEGAL SEARCH" FAILS

#### Search Warrant

The Fourth Amendment provides that search warrants shall not be issued, except "upon probable cause, supported by oath or affirmation."  U.S. Const. Amend. IV.  "A search warrant affidavit is presumed reliable."  United States v. Klump, 536 F.3d 113, 119 (2d Cir. 2008) (citing Franks v. Delaware, 438 U.S. 154, 171, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978)). "In certain circumstances, however, a [plaintiff] may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure."  United States v. Awadallah, 349 F.3d 42, 64 (2d Cir. 2003).

"A section 1983 plaintiff challenging a warrant on this basis must make the same showing that is required at a suppression hearing under Franks v. Delaware, 438 U.S. 154, 155-56, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978): the plaintiff must show that the affiant knowingly

and deliberately, or with a reckless disregard of the truth, made false statements or material omissions in his application for a warrant, and that such statements or omissions were necessary to the finding of probable cause." Velardi v. Walsh, 40 F.3d 569, 573 (2d Cir. 1994).  The Supreme Court has emphasized that not every statement in a warrant affidavit has to be true "in the sense that every fact recited . . . is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." Franks, 438 U.S. at 165.  Moreover, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts," and the task of the issuing magistrate is simply to make a practical, common-sense decision as to whether, given the totality of the circumstances set forth in the affidavit, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 232, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983); see, e.g., United States v. Falso, 544 F.3d 110, 117 (2d Cir. 2008).

Here, there is no evidence to support plaintiffs' allegation that defendants unlawfully entered their residence.  The evidence, actually, is to the contrary: that defendants' entry into 60 Moore Street, Apt. 6C was lawful. Defendants entered plaintiffs' residence on February 2, 2017 pursuant to a search warrant issued by the Honorable A. Calabrese of the Supreme Court on January 27, 2017.[2]  The search warrant established probable cause for "No Knock" entry into plaintiffs' residence, and under Klump, is "presumed reliable."

The search warrant's presumption of reliability is a rebuttable one, but plaintiffs do not assert in their Amended Complaint, and cannot provide any facts obtained from discovery

---

[2] See Def. 56.1 at ¶ 1.

in this matter, which, under <u>Awadallah</u>, "undermine the validity of the warrant and the resulting search or seizure."  In plaintiffs' Amended Complaint, they allege that defendants misled the issuing magistrate to think that the subject of the search warrant resided at 60 Moore Street, Apt. 6C.[3]  However, the search warrant affidavit clearly sets forth that the reason the police wanted to search 60 Moore Street, Apt. 6C is that they had conducted two controlled buys at the location with the assistance of a confidential informant, and had reason to believe that contraband, particularly heroin and cocaine, were being stored and sold out of 60 Moore Street, Apt. 6C by an individual who had previously provided that location as his address.[4]

Review of the search warrant affidavit provides absolutely no basis upon which to conclude that the search warrant issued for plaintiffs' residence was based on any falsehoods, or the result of any member of the NYPD intentionally, recklessly or negligently misleading a magistrate.  At this point, plaintiffs may not simply rely on conclusory allegations, conjecture and speculation in order to create a genuine issue of fact.  They must present evidence in support of their claim.  Since plaintiffs have no evidence to support their allegation of unlawful entry, this claim must be dismissed.

**<u>Search of Apartment 6C</u>**

Likewise, plaintiffs have no evidence to support the claim that their residence was unlawfully searched.  Considering that defendants had a search warrant, not only was entry into plaintiffs' apartment lawful, but so was the search of the apartment which followed that entry. The search warrant issued by the Hon. Calabrese specified that defendants were authorized to search, between 6 am and 9 pm, plaintiffs' apartment for "heroin and crack cocaine,

---

[3] <u>See</u> Amended Complaint, Docket No. 31, at ¶¶ 35 and 39.
[4] <u>See</u> Search Warrant Affidavit, annexed to the September 6, 2019 Declaration of Lucienne Pierre in Support of Defendants' Motion for Summary Judgment ("Pierre Decl.") as Exhibit "B," at ¶¶ 3, 5-8, 10.

paraphernalia commonly used to process and package heroin and crack cocaine; documents relating to the illegal trafficking of heroin and crack cocaine and the ownership and recent occupation of the location; U.S. currency relating to the illegal trafficking of heroin and crack cocaine; computer hardware, computer software, cellular telephones and any written record reflecting the passwords or encryption pass phrase used to secure or limit access to the computer and related storage devices."[5]

Given the scope of the search warrant, there is no evidence in this case of defendants having improperly searched the apartment. Plaintiff Kenya Thomas did not witness the search of any room, and thus has no firsthand knowledge upon which she can base any claim of unlawful search.[6] Plaintiff Tyanna Miller saw police officers searching behind two nightstands and a bed in the room she was in,[7] both of which are places where all of the items listed in the search warrant (heroin, cocaine, paraphernalia, etc.) could have been found. Plaintiff Kenya Thomas states that the search warrant execution began at 9 am, and lasted approximately four hours.[8] Plaintiff Tyanna Miller states that the search warrant execution began about 7 or 8 am, and lasted approximately two hours.[9] A search that began at seven or eight or nine am and lasted between 2-4 hours, focusing on areas where the items listed in the search warrant could be found, was well within the scope of the search warrant. Plaintiffs' contention that the search should have ended when defendants realized the person identified in the search warrant was not present is inapposite, since the search warrant was just that – a *search*

---

[5] See Search Warrant, annexed to the Pierre Decl. as Exhibit "A."
[6] See Def. 56.1 at ¶¶ 6-7.
[7] See Def. 56.1 at ¶ 17.
[8] See Def. 56.1 at ¶ 12.
[9] See Def. 56.1 at ¶ 19.

warrant, not an arrest warrant.  For these reasons, plaintiffs' claim alleging unlawful search of their apartment must be dismissed.

### Property

There is no section 1983 claim against the state actor for deprivation of property 'so long as the state provides an adequate post-deprivation remedy and the deprivation was the result of a 'random and unauthorized' act.'" Cox v. City of New York, No. 13-CV-163, 2014 WL 3696003, 2014 U.S. Dist. LEXIS 100552, at *29 (E.D.N.Y. July 22, 2014) (citing Cantave v. New York City Police Officers, No. 09-CV-2226 (CBA) (LB), 2011 U.S. Dist. LEXIS 34231, 2011 WL 1239895, at *7 (E.D.N.Y. Mar. 28, 2011)).  See also Esperanza v. City of New York, 325 F. Supp. 3d 288, 307 (E.D.N.Y. 2018) (stating that Article 78 proceeding is a perfectly adequate post-deprivation remedy).

Plaintiff Miller admits that defendants did not destroy any furniture while searching the room that she was in.[10]  Plaintiff Thomas alleges that during the February 2, 2017 search warrant execution at 60 Moore Street, Apt. 6C, members of the NYPD damaged a television and dresser in her bedroom.[11]  Plaintiff Thomas makes this claim regarding NYPD damaging her property even though she did not witness any such damage taking place – she admits that she did not witness the search of any room.[12]  Plaintiff Thomas claims that on February 2, 2017, using her phone, she photographed the alleged damage to the television and dresser.[13]  The phone plaintiff Thomas used to take the photographs remained in her possession up until August 2018 – long after she filed a notice of claim on February 13, 2017 relating to the

---

[10] See Def. 56.1 at ¶ 18.
[11] See Def. 56.1 at ¶ 8.
[12] See Def. 56.1 at ¶¶ 6-8.
[13] See Def. 56.1 at ¶ 9.

February 2, 2017 incident.[14]   However, plaintiff Thomas has not produced any photographs in the instant lawsuit, because she claims that she did not preserve the photographs of the alleged damage to the television and dresser.[15]

Before filing this lawsuit, plaintiff Thomas did not file an Article 78 proceeding, or seek any other post-deprivation remedy, with respect to the allegedly destroyed property. Because plaintiff Thomas failed to exhaust the available post-deprivation remedies, her 42 U.S.C. § 1983 claim for unreasonable seizure of property / property damage is barred.  See Liranzo v. City of New York, 2012 U.S. Dist. LEXIS 178872, at *34-35 (S.D.N.Y. Dec. 11, 2012) (granting summary judgment on plaintiffs' unreasonable entry, search and seizure claims after finding that the state provided adequate post-deprivation remedies sufficient to defeat plaintiffs' constitutional claims seeking damages for lost and damaged property).  Even if plaintiff Thomas' claim regarding damaged property was not barred, it would still merit dismissal, due to lack of any evidence in support of her claims upon which a jury could find in her favor.

## POINT II

### THE INDIVIDUAL MALE DEFENDANTS SHOULD BE DISMISSED BECAUSE PLAINTIFFS CANNOT PROVE PERSONAL INVOLVEMENT

The personal involvement of a defendant in the deprivation of a constitutional right is a prerequisite to the imposition of liability and damages in a § 1983 action.  See Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986) (internal citation omitted), cert. denied, 434 U.S. 1087, 98 S. Ct. 1282, 55 L. Ed. 2d 792 (1978); see also Taylor v. Brentwood Union Free Sch. Dist., 143 F.3d 679, 685 (2d Cir. 1998) (stating that liability may only be imposed upon a

---

[14] See Def. 56.1 at ¶ 10.
[15] See Def. 56.1 at ¶ 11.

defendant if the defendant personally subjected the plaintiff to the deprivation of a federal right).

Here, not only is there no evidence that any individual male defendant violated plaintiffs'

constitutional rights, there is not even any allegation – from the plaintiffs themselves - that any

individual male defendant violated plaintiffs' constitutional rights.   For the reasons set forth

below, plaintiffs' claims against the male defendants fail because plaintiffs cannot prove

personal involvement.   Because there are three separate male officers named in the Amended

Complaint, plaintiffs' claims against each male defendant are examined separately.

### Police Officer Leonard Clarke

Plaintiffs' Amended Complaint alleges that Officer Clarke participated in the

actual entry of the apartment and failed to take any steps to ensure that the Constitutional rights

of the plaintiffs would be respected, and directly participated in ensuring that plaintiffs were not

permitted to cover their naked or almost naked bodies before male officers or did nothing to stop

it.[16]   Plaintiffs' Amended Complaint further alleges that Officer Clarke failed to terminate the

search when he realized that defendants were searching an apartment in which the person sought

was not present and/or that the contraband sought was not present.[17]   Other than these bare-bones

allegations, plaintiffs' Amended Complaint does not provide any specific allegations regarding

what Officer Clarke actually did that purportedly violated their constitutional rights.   At their

depositions, neither plaintiff made any specific allegations against Officer Clarke.   The gravamen

of plaintiff Miller's claims in this lawsuit is alleged sexual assault, and plaintiff Miller specifies

that it was a female officer who allegedly sexually assaulted her.[18]   And, when asked directly

whether she is suing any male officers, Plaintiff Thomas replied "No."[19]

---

[16] See Amended Complaint, Docket No. 31, at ¶ 14.
[17] See id.
[18] See id. at ¶ 11.
[19] See Def. 56.1 at ¶ 13.

Evidence obtained during discovery in this litigation establishes the extent of Officer Clarke's participation in the investigation which led to a search warrant being issued for 60 Moore Street, Apt. 6C, and the search warrant execution itself. Prior to NYPD obtaining a search warrant for 60 Moore Street, Apartment 6C, Defendant Officer Clarke field tested the narcotics purchased by a confidential informant at 60 Moore Street, Apartment 6C, and found that the results of the field tests were positive for heroin and crack cocaine.[20]  On the day of the search warrant execution, Officer Clarke was ordered by his supervisor, defendant Sergeant Cheesewright, to search the first room, search the living room, before exiting the apartment.[21] Officer Clarke complied with Sergeant Cheesewright's order, and then left the apartment.[22]

The search of the first room, the living room, was the extent of Officer Clarke's involvement in the execution of the search warrant.  Officer Clarke did not search anyone, did not pat anyone down, and did not witness any searches done on any females.[23]  Officer Clarke heard someone request a female officer to assist with the search of female detainees, but other than that, has no knowledge of searches of plaintiffs' persons.[24]

Plaintiffs' allegations against Officer Clarke, as articulated in the Amended Complaint, are insufficient for a finding of liability by a reasonable jury, absent any evidence in support of those allegations.  Certainly plaintiffs' deposition testimony – where they make zero

---

[20] See Complaint Follow-up Informational Report, Field Test Report, and Property Clerk Invoice relating to a controlled buy for heroin ("Controlled Buy No. 1"), annexed to the Pierre Decl. as Exhibit "C," and Complaint Follow-up Informational Report, Field Test Report, and Property Clerk Invoice relating to a controlled buy for crack cocaine ("Controlled Buy No. 2"), annexed to the Pierre Decl. as Exhibit "D."   See also Search Warrant Affidavit at ¶ 11, Pierre Decl. Exhibit B.

[21] See Deposition of Defendant Police Officer Leonard Clarke dated June 13, 2019, ("Clarke Dep."), annexed to the Pierre Decl. as Exhibit "I," at 17:2-8.

[22] See Clarke Dep. at 17:11-13, Pierre Decl. Exhibit I.

[23] See Clarke Dep. at 19:17-20:3, Pierre Decl. Exhibit I.

[24] See Clarke Dep. at 22:19-23, Pierre Decl. Exhibit I.

allegations against Officer Clarke – are insufficient for any finding of liability against him in this lawsuit.  Officer Clarke's actions – field testing narcotics purchased by a confidential informant, participating in the execution of a search warrant by complying with his supervisor's orders to search the first room, the living room, and hearing someone call for a female officer to search female detainees – also are insufficient for a finding of liability against him in this lawsuit.

General assistance provided in a case is insufficient to establish personal involvement; plaintiffs must establish a tangible connection between Officer Clarke's specific actions and the constitutional injuries they claim they suffered.  See Frederick v. City of New York, No. 13-CV-897 (MKB), 2013 U.S. Dist. LEXIS 58166, 2013 WL 1753063, at *8 (E.D.N.Y. Apr. 22, 2013) (stating that a plaintiff must allege a tangible connection between the acts of the defendant and the injuries suffered).  Where there is no evidence upon which a reasonable jury could find Officer Clarke's involvement in any alleged violation of plaintiffs' constitutional rights, summary judgment should be granted dismissing him from this action.

### Sergeant David Chesewright

Plaintiffs' Amended Complaint alleges that Sgt. Cheesewright was involved in the planning and execution of the search warrant, and was most likely present at the time of the search warrant execution.[25]  At their depositions, neither plaintiff made any specific allegations against Sergeant Cheeswright.  The gravamen of plaintiff Miller's claims in this lawsuit is alleged sexual assault, and plaintiff Miller specifies that it was a female officer who allegedly sexually assaulted her.[26]  And, when asked directly whether she is suing any male officers, Plaintiff Thomas replied "No."[27]

---

[25] See Amended Complaint, Docket No. 31, at ¶ 15.
[26] See id. at ¶ 11.
[27] See Def. 56.1 at ¶ 13.

Evidence obtained during discovery in this litigation establishes the extent of Sergeant Cheesewright's participation in the investigation which led to a search warrant being issued for 60 Moore Street, Apt. 6C, and the search warrant execution itself.  Prior to execution of the search warrant, Sergeant Cheesewright supervised two controlled buys conducted with the assistance of a confidential informant.[28]  On the day of the search warrant execution, Sergeant David Cheesewright was the FIO Supervisor for Borough Brooklyn North, responsible for supervising execution of the search warrant.[29]

Sgt. Cheesewright's understanding is that they were searching 60 Moore Street, Apt. 6C for drugs.[30]  Sgt. Cheesewright's job was to supervise the search execution, rather than do any searches himself -- but he might have looked around, peeking in a drawer or under a mattress.[31]  Sergeant Cheesewright went from room to room supervising the searches, but did not witness the plaintiffs being searched.[32]

The allegations in plaintiffs' Amended Complaint regarding Sgt. Cheesewright, their (nonexistent) deposition testimony about Sgt. Cheesewright, and the facts enumerated above, obtained during discovery in this action, do not establish Sgt. Cheesewright's personal involvement in any alleged constitutional violation of plaintiffs' rights.  As such, summary judgment should be granted dismissing Sgt. Cheesewright from this action, because plaintiffs cannot prove personal involvement – i.e. any tangible connection between the actions of Sgt. Cheesewright and the constitutional injuries they claim they suffered.

---

[28] See Controlled Buys Nos. 1 and 2, Pierre Decl. Exhibits C and D.
[29] See Deposition of Defendant Sergeant David Cheesewright dated June 13, 2019 ("Cheesewright Dep."), annexed to the Pierre Decl. as Exhibit "J," at 5:19-6:3.
[30] See Cheesewright Dep. at 6:7-9, Pierre Decl. Exhibit J.
[31] See Cheesewright Dep. at 12:10-19, Pierre Decl. Exhibit J.
[32] See Cheesewright Dep. at 17:19-18:6; 20:6-8; 28:12-29:11, Pierre Decl. Exhibit J.

### Police Officer Andrew Kamna

Plaintiffs' Amended Complaint alleges that Police Officer Andrew Kamna participated in the planning and actual entry of 60 Moore Street, and specifically that "Kamna acted as the overall supervisor of the raid."[33]  Plaintiffs' Amended Complaint alleges that Officer Kamna, "as the overall supervisor," "was required to approve any strip search," and in fact approved "excessive searches of the plaintiffs as well as the overall treatment of the plaintiffs without regard to their Constitutional rights."[34]  Plaintiffs' Amended Complaint alleges that Kamna failed to terminate the search of the apartment when he realized that the subject sought was not present and/or that the contraband sought was not present.[35]

At their depositions, neither plaintiff made any specific allegations against Officer Kamna.  The gravamen of plaintiff Miller's claims in this lawsuit is alleged sexual assault, and plaintiff Miller specifies that it was a female officer who allegedly sexually assaulted her.[36]  And, when asked directly whether she is suing any male officers, Plaintiff Thomas replied "No."[37]

Evidence obtained during discovery in this litigation establishes the extent of Officer Kamna's participation in the investigation which led to a search warrant being issued for 60 Moore Street, Apt. 6C, and the search warrant execution itself.  Police Officer Kamna was the affiant on the affidavit which ultimately led to issuance of a search warrant for 60 Moore Street, Apt. 6C in Brooklyn, New York.[38]  A confidential informant informed Officer Kamna that there

---

[33] See Amended Complaint, Docket No. 31, at ¶ 14.
[34] See id.
[35] See id.
[36] See id. at ¶ 11.
[37] See Def. 56.1 at 13.
[38] See Search Warrant Affidavit, Pierre Decl. Exhibit B.

were drug sales – crack and heroin – at 60 Moore Street.[39]  On two different occasions, Officer

Kamna conducted controlled buys at 60 Moore Street, with the assistance of a confidential

informant.[40]   Officer Kamna also conducted a photographic array with the confidential

informant, in an effort to identify the individual at 60 Moore Street from whom the confidential

informant had purchased narcotics.[41]

On the day of the search warrant execution, Officer Kamna searched a living

room / bedroom area, where he issued a C-summons to a male for unlawful possession of

marijuana.[42]  Upon entering the living room / bedroom area, prior to conducting his search,

Officer Kamna explained to the two individuals in that room why he was there, and that they [the

NYPD] had a search warrant for the location.[43]  Officer Kamna then proceeded to search the

living room / bedroom area.[44]  Officer Kamna recalls a female officer being called to the scene,

and a female officer arriving.[45]  Generally, as a Police Officer, Officer Kamna does not direct

other officers, and on the specific day of the search warrant execution at issue in this suit, he did

not direct any police officers to search any other rooms or perform any strip searches.[46]

Evidence obtained in discovery reveals that the allegations in plaintiffs' Amended

Complaint – that Officer Kamna was the overall supervisor of the raid and directed other officers

to  excessively  search  plaintiffs  –  are  untrue.   Plaintiffs  themselves  gave  sworn  deposition

testimony  during  which  neither  one  of  them  made  any  specific  allegations  against  Officer

---

[39]  See Deposition of defendant Police Officer Andrew Kamna dated May 8, 2019 ("Kamna Dep."), annexed to the Pierre Decl. as Exhibit "K," at 16:7-17.
[40]  See Kamna Dep. at 16:18-25, Pierre Decl. Exhibit K.
[41]  See Kamna Dep. at 18:4-19:14, Pierre Decl. Exhibit K.
[42]  See Kamna Dep. at 25:9-26:2; 27:1-5, Pierre Decl. Exhibit K.
[43]  See Kamna Dep. at 34:2-6, Pierre Decl. Exhibit K.
[44]  See Kamna Dep. at 34:7-21, Pierre Decl. Exhibit K.
[45]  See Kamna Dep. at 38:24-39:18, Pierre Decl. Exhibit K.
[46]  See Kamna Dep. at 36:11-15; 52:1-3; 65:7-15, Pierre Decl. Exhibit K.

Kamna.  Evidence obtained during discovery does not establish Officer Kamna's personal involvement in any alleged constitutional violation of plaintiffs' rights.

What the evidence establishes is that, as a member of a narcotics team, Officer Kamna performed police duties such as handling a confidential informant, doing a photo array, serving as the affiant for a search warrant affidavit, and ultimately obtaining a search warrant for a location where there was probable cause to believe that drug sales were taking place.  During the search warrant execution itself, Officer Kamna searched one room, did not search either of the plaintiffs, and did not direct anyone to "excessively search" "strip-search" or otherwise violate plaintiffs' constitutional rights.  This is all to say that plaintiffs cannot prove any tangible connection between the actions of Officer Kamna and the constitutional injuries they claim they suffered.  As such, summary judgment should be granted dismissing Officer Kamna from this action.

### POINT III

### THE INDIVIDUAL MALE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

Defendants Officer Clarke, Sergeant Cheesewright and Officer Kamna are entitled to qualified immunity.  A defendant is entitled to qualified immunity under federal law if (1) the defendant's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for the defendant to believe his actions were lawful at the time of the challenged act.  Fleurimond v. Holder, No. 16-CV-750 (PKC) (ST), 2019 WL 3975004, 2019 U.S. Dist. LEXIS 142140, at *17 (E.D.N.Y. Aug. 21, 2019) (citing Tooly v. Schwaller, 919 F.3d 165, 172 (2d Cir. 2019)).  Even if this Court were to decide that there was no probable cause to search 60 Moore Street Apt. 6C, on February 2, 2017, it was objectively reasonable for defendants Officer Clarke,

Sergeant Cheesewright and Officer Kamna to believe that probable cause, or at least arguable probable cause, existed, considering that they had a search warrant. See Smith v. City of New York, 2010 WL 3397683, 2010 U.S. Dist. LEXIS 88774, at *43 (S.D.N.Y. Aug. 27, 2010) (holding that valid search warrant authorizing the officers to enter and search plaintiff's place of business presumptively established probable cause to do so, and that even if plaintiff were able to successfully challenge the validity of the search warrant, and thus probable cause, defendant would nonetheless be entitled to qualified immunity under a theory of arguable probable cause.) See also Gonzalez v. City of Schenectady, 728 F.3d 149, 161-62 (2d Cir. 2013).

### POINT IV

### PLAINTIFFS' ILLEGAL STRIP SEARCH/BODY CAVITY SEARCH CLAIMS FAIL

Plaintiffs allege that on February 2, 2017, during the search warrant execution, a female officer performed an illegal strip search / body cavity search on them, in violation of 42 U.S.C. § 1983.[47] Defendants deny these claims. Even resolving all ambiguities and drawing all reasonable inferences in the light most favorable to plaintiffs, however, plaintiffs' claims of illegal strip search / body cavity search fail.

Before proceeding to an analysis of plaintiffs' claims, it is useful to define terms, as they have previously been interpreted by the Second Circuit: (1) a "strip search" occurs when a suspect is required to remove his clothes; (2) a "visual body cavity search" is one in which the police observe the suspect's body cavities without touching them (as by having the suspect to bend over, or squat and cough, while naked); and (3) a "manual body cavity search" occurs when the police put anything into a suspect's body cavity, or take anything out. See Gonzalez v. City

---

[47] See Amended Complaint, Docket No. 31, at ¶¶ 9-11; 18-21.

of Schenectady, 728 F.3d 149, 158 (2d Cir. 2013) (citing People v. Hall, 10 N.Y.3d 303, 306-07,

886 N.E.2d 162, 856 N.Y.S.2d 540 (2008)).  Because the two plaintiffs in this matter each allege

different underlying facts with respect to this claim, each plaintiff's allegation will be examined

separately.

### Plaintiff Thomas' Allegations of Illegal Strip Search / Body Cavity Search

On February 2, 2017, plaintiff Thomas lived at 60 Moore Street, Apt. 6C, in

Brooklyn, New York.[48]  NYPD's entrance into the apartment woke plaintiff Thomas up, who

had been sleeping in her bedroom.[49]  A SWAT team wearing masks, a bulletproof vest, and with

guns drawn entered plaintiff Thomas' bedroom and ordered her to not move.[50]  Plaintiff Thomas

complied with the order not to move.[51]  Plaintiff Thomas was lying on her side when the NYPD

entered her bedroom and ordered her to lie on her stomach.[52]  Plaintiff Thomas complied with

the NYPD order to lie on her stomach.[53]  While plaintiff Thomas was lying on her stomach, she

was handcuffed with her hands behind her.[54]

An NYPD officer then stood plaintiff Thomas up, and escorted her to her sister's

room, in which two other women, Pamela Thomas and Nuria Thomas, were already present,

handcuffed.[55]  The three women sat in different positions at the head, middle and footboard of

---

[48]  See Deposition of Plaintiff Kenya Thomas dated June 20, 2017 ("Thomas Dep."), annexed to the Pierre Decl. as Exhibit "E," at 19:6-8.
[49]  See Thomas Dep. at 57:16-18; 58:7-11, Pierre Decl. Exhibit E.
[50]  See Thomas Dep. at 63:12-19, Pierre Decl. Exhibit E.
[51]  See Thomas Dep. at 63:20-21, Pierre Decl. Exhibit E.
[52]  See Thomas Dep. at 71:6-15, Pierre Decl. Exhibit E.
[53]  See Thomas Dep. at 71:16-17, Pierre Decl. Exhibit E.
[54]  See Thomas Dep. at 74:14-16, Pierre Decl. Exhibit E.
[55]  See Thomas Dep. at 74:21-22; 75:7-10; 76:9-13, Pierre Decl. Exhibit E.

the bed in Pamela Thomas' bedroom.[56]   Plaintiff Thomas heard a male member of the NYPD state that they had three women that needed to be searched.[57]

A female officer arrived, and searched plaintiff Thomas.[58]   While Officer Penner, the only female defendant in this case, is a non-Hispanic white woman of Irish descent,[59] plaintiff Thomas describes the female officer who searched her as being "white Spanish."[60]   Per plaintiff Thomas' testimony, to conduct the search, the female officer asked plaintiff Thomas to stand.[61]   The female officer asked plaintiff Thomas to turn around; the female officer removed plaintiff Thomas' handcuffs.[62]   The female officer ordered plaintiff Thomas to put her hands up above her head, and plaintiff Thomas complied.[63]   The female officer told plaintiff Thomas to open her legs wider than they were already open, and Plaintiff Thomas complied, such that she was left standing with her legs in the form of a "V."[64]

The female officer pushed plaintiff Thomas' thighs out from each other, because plaintiff Thomas' thighs were not fully separated.[65]   The female officer searched from plaintiff Thomas' waist down to her feet.[66]   More specifically, for each of plaintiff Thomas' legs, the female officer searched from the top of plaintiff Thomas' thighs, down to each foot.[67]   The female officer searched both of plaintiff Thomas' legs together.[68]   During her search, in one

---

[56] See Thomas Dep. at 78:1-5, Pierre Decl. Exhibit E.
[57] See Thomas Dep. at 82:1-3, Pierre Decl. Exhibit E.
[58] See Thomas Dep. at 82:10-25, Pierre Decl. Exhibit E.
[59] See Def. 56.1 at ¶ 25.
[60] See Def. 56.1 at ¶ 24.
[61] See Thomas Dep. at 83:10-11, Pierre Decl. Exhibit E.
[62] See Thomas Dep. at 83:12-14, Pierre Decl. Exhibit E.
[63] See Thomas Dep. at 83:19-22; 84:6-7, Pierre Decl. Exhibit E.
[64] See Thomas Dep. at 83:23-84:5, Pierre Decl. Exhibit E.
[65] See Thomas Dep. at 85:1-13, Pierre Decl. Exhibit E.
[66] See Thomas Dep. at 84:8-14, Pierre Decl. Exhibit E.
[67] See Thomas Dep. at 85:25-86:4, Pierre Decl. Exhibit E.
[68] See Thomas Dep. at 84:18-20, Pierre Decl. Exhibit E.

motion, plaintiff Thomas alleges that the female officer touched the outside lips of plaintiff Thomas' vagina, and plaintiff Thomas' clitoris for approximately 15 seconds.[69]

Plaintiff Thomas does not allege that the female officer penetrated her in any way.[70]  The female officer's search of plaintiff Thomas' legs took about five to seven seconds.[71]  The female officer also searched plaintiff Thomas' back, torso and under her breasts.[72]  The female officer searched under plaintiff Thomas' breasts for about five to six seconds.[73]  The female officer did not need to search plaintiff Thomas' arms because they were fully visible, since plaintiff Thomas was wearing a sleeveless nightgown, with her hands above her head.[74]  The female officer left after she physically searched plaintiff Thomas.[75]

During the search of her person, plaintiff Thomas was wearing a short silk sheer blueish green nightgown with spaghetti straps.[76]  Plaintiff Thomas' nightgown was just long enough to cover her stomach, butt and vagina area.[77]  Plaintiff Thomas was not wearing a bra or underwear.[78]

The search that plaintiff Thomas alleges the female officer performed on her does not fit any of the <u>Gonzalez</u> definitions of a strip search or body cavity search.  NYPD conducted the search warrant execution early in the morning – a time scope permitted by the warrant -- while Thomas was still in bed and dressed in sleepwear, without a bra or underwear.  A strip search occurs when a suspect is required to remove her clothes, and here, plaintiff Thomas does

---

[69] <u>See</u> Thomas Dep. at 86:15-17; 87:2-10; 104:22-105:2, Pierre Decl. Exhibit E.
[70] <u>See</u> Thomas Dep. at 86:10-14, Pierre Decl. Exhibit E.
[71] <u>See</u> Thomas Dep. at 105:3-7; 105:11-14, Pierre Decl. Exhibit E.
[72] <u>See</u> Thomas Dep. at 89:2-4, Pierre Decl. Exhibit E.
[73] <u>See</u> Thomas Dep. at 105:24-106:4, Pierre Decl. Exhibit E.
[74] <u>See</u> Thomas Dep. at 105:15-20, Pierre Decl. Exhibit E.
[75] <u>See</u> Thomas Dep. at 103:11-14, Pierre Decl. Exhibit E.
[76] <u>See</u> Thomas Dep. at 62:3-9, Pierre Decl. Exhibit E.
[77] <u>See</u> Thomas Dep. at 62:10-17, Pierre Decl. Exhibit E.
[78] <u>See</u> Thomas Dep. at 65:8-11, Pierre Decl. Exhibit E.

not allege (and there is no evidence) that any officer ever ordered her to remove her clothing. The fact that plaintiff Thomas was dressed in sleepwear, without a bra or underwear, when the female officer searched her does not convert an ordinary search into a "strip search."  On that basis alone, plaintiff Thomas's claim for an illegal "strip search" should be dismissed.

Additionally, there is no evidence in this case that plaintiff Thomas was ever subjected to a body cavity search.  Under Gonzalez, a visual body cavity search occurs when the police observe the suspect's body cavities without touching them (as by having the suspect bend over, squat and cough, while naked).  A manual body cavity search occurs when the police put anything into a suspect's body cavity, or take anything out.  Plaintiff Thomas does not allege (and there is no evidence) that she was ever ordered by any member of the NYPD to strip naked, bend over, squat and cough.  Plaintiff Thomas does not allege (and there is no evidence) that any member of the NYPD ever put anything into, or took anything out of, any of her body cavities. Plaintiff Thomas does not allege that the female officer penetrated her in any way.  As such, plaintiff Thomas' claims of an illegal "body cavity" search in violation of 42 U.S.C. § 1983 must also be dismissed.

Crediting, for the purposes of this motion only, plaintiff Thomas' allegations that while the female officer searched her person, the female officer touched her breasts and vagina, the search that plaintiff  Thomas alleges does not violate 42 U.S.C. § 1983.  Again, the manner in which plaintiff Thomas was dressed when the police were executing the search warrant does not transform an otherwise routine search of her person into a constitutional violation.  Nothing in the record provided by plaintiff Thomas suggests that she was subjected to anything beyond a standard search that has repeatedly been upheld as reasonable under the Fourth Amendment.  See e.g.  Scalpi v. Amorim, No. 14-CV-2126 (KMK), 2018 U.S. Dist. LEXIS 53420, at *48

(S.D.N.Y. Mar. 29, 2018) ("Courts in the Second Circuit have consistently held that such brief contact with an arrestee's breasts or genital area during a pat-down, without more, is insufficient to violate the Fourth Amendment.") (collecting cases); <u>Chunyu Jean Wang v. Vahldieck</u>, No. 09-CV-3783 (ARR) (VVP), 2012 WL 92423, 2012 U.S. Dist. LEXIS 3763, at *31-32 (E.D.N.Y. Jan. 9, 2012) (finding that it does not rise to a violation of constitutional proportion that an officer during the course of a manual search might come into contact with the arrestee's skin). <u>See also</u> <u>Wright v. City of Waterbury</u>, 3:07-cv-306 (CFD), 2011 WL 1106217, 2011 U.S. Dist. LEXIS 29666, at *20 (D. Conn. 2011) (dismissing Fourth Amendment claim where female police officer "cupped" male plaintiff's groin area on two occasions during frisk and citing similar cases); <u>Burke v. Cicero Police Dep't</u>, 2010 WL 1235411, 2010 U.S. Dist. LEXIS 31414 (N.D.N.Y. 2010) (dismissing claim where male defendant "patt[ed] and squeeze[ed]" plaintiff's legs and "breasts on down"). For the reasons set forth above, plaintiff Kenya Thomas' illegal strip search / body cavity search should be dismissed. At minimum, the female officer is entitled to qualified immunity on plaintiff Thomas' claims.

### **Plaintiff Miller's Allegations of Illegal Strip Search / Body Cavity Search**

When the NYPD executed the search warrant at 60 Moore Street, Apt. 6C, plaintiff Tyanna Miller was sleeping in bed with her then-boyfriend, Ira Thomas.[79] When the NYPD entered the room plaintiff Miller was in, she was unclothed.[80] An NYPD officer ordered plaintiff Miller not to move.[81] Ira Thomas was handcuffed, and laid on the bed.[82] Plaintiff Miller was handcuffed by a male officer in uniform.[83] No male officers ever touched plaintiff

---

[79] <u>See</u> Deposition of Plaintiff Tyanna Miller dated June 6, 2019 ("Miller Dep."), annexed to the Pierre Decl. as Exhibit "G," at 15:25-16:2; 39:7-19; 40:14-15.
[80] <u>See</u> Miller Dep. at 41:8-14, Pierre Decl. Exhibit G.
[81] <u>See</u> Miller Dep. at 42:5-7, Pierre Decl. Exhibit G.
[82] <u>See</u> Miller Dep. at 44:12-14, Pierre Decl. Exhibit G.
[83] <u>See</u> Miller Dep. at 42:14-21, Pierre Decl. Exhibit G.

Miller, except for when her wrists were handcuffed.[84]  Plaintiff Miller alleges that she tried to hold a blanket in front of her body to cover herself, but an officer took the blanket.[85]

Plaintiff Miller heard someone call for a female officer.[86]  After about 5-10 minutes, a female officer arrived.[87]  While Officer Penner, the only female defendant in this case, is (and was on February 2, 2017) a non-Hispanic white woman of Irish descent with light brown / dirty blond colored hair, plaintiff Miller describes the female officer who searched her as having "black hair," and being of "Puerto Rican descent." [88]  Officer Penner was in uniform on February 2, 2017; plaintiff Miller states that the female officer who searched her was dressed in regular clothes.[89]

Plaintiff Miller claims that the female officer patted her down, and allegedly "kind of like groped" her.[90]  Plaintiff Miller alleges that the female officer groped her breast area.[91]  Plaintiff Miller alleges that the female officer touched the outside of her vagina, her breast and butt area, and her legs.[92]  Plaintiff Miller alleges that the female officer inserted two of her fingers into plaintiff Miller's vagina, twice.[93]  Plaintiff Miller estimates that the female officer searched her for 1-2 minutes.[94]

Plaintiff Miller alleges that after the female officer searched her, plaintiff Miller asked if she could get dressed, and the female officer helped plaintiff Miller get dressed, putting

---

[84] See Miller Dep. at 42:22-43:3, Pierre Decl. Exhibit G.
[85] See Miller Dep. at 42:8-13, Pierre Decl. Exhibit G.
[86] See Miller Dep. at 43:7-12, Pierre Decl. Exhibit G.
[87] See Miller Dep. at 43:4-6, Pierre Decl. Exhibit G.
[88] See Def. 56.1 at ¶¶ 23 and 25.
[89] See Def. 56.1 at ¶¶ 23 and 26.
[90] See Miller Dep. at 44:15-24, Pierre Decl. Exhibit G.
[91] See Miller Dep. at 44:25-45:1, Pierre Decl. Exhibit G.
[92] See Miller Dep. at 45:15-19, Pierre Decl. Exhibit G.
[93] See Miller Dep. at 45:2-7; 45:20-46:5; 46:9-20, Pierre Decl. Exhibit G.
[94] See Miller Dep. at 46:6-8, Pierre Decl. Exhibit G.

shorts and a t-shirt on her.[95]   The female officer did not touch plaintiff Miller's private areas in the process of dressing plaintiff Miller.[96]   No member of the NYPD ever touched plaintiff Miller after that, except to uncuff her.[97]   Prior to being uncuffed, plaintiff Miller complained to a male NYPD officer about the handcuffs being too tight, and he loosened them.[98]   Plaintiff Miller does not allege that any male officer ever touched her vagina or breasts, and she does not allege that any male officers ever inserted anything into her vagina.[99]

Plaintiff Miller claims that the day after the February 2, 2017 search warrant, she went to the OBGYN at Woodhull Medical Center, and that the result of the OBGYN's examination of her was that she "was fine" and "there wasn't anything wrong."[100]   Woodhull Medical Center has no record of plaintiff Miller ever being treated there on or after February 2, 2017.[101]   Furthermore, at the pre-motion conference held in this matter, plaintiff Miller's counsel admitted that the medical records his client had testified under oath existed, do not in fact exist.[102]

The search that plaintiff Miller alleges the female officer performed on her does not fit any of the Gonzalez definitions of a strip search.   NYPD conducted the search warrant execution early in the morning – a time scope permitted by the warrant -- while Miller was still in bed and unclothed.   A strip search occurs when a suspect is required to remove her clothes, and here, plaintiff Miller does not allege (and there is no evidence) that any officer ever ordered

---

[95] See Miller Dep. at 46:21-47:6, Pierre Decl. Exhibit G.
[96] See Miller Dep. at 47:7-9, Pierre Decl. Exhibit G.
[97] See Miller Dep. at 47:10-22, Pierre Decl. Exhibit G.
[98] See Miller Dep. at 55:21-23; 56:11-14, Pierre Decl. Exhibit G.
[99] See Miller Dep. at 51:21-52:8, Pierre Decl. Exhibit G.
[100] See Def. 56.1 at ¶ 27.
[101] See Def. 56.1 at ¶ 28.
[102] Defendants have ordered a transcript of the July 2, 2019 Conference held in this matter, wherein plaintiff's counsel made this admission, and will furnish supplement this brief with the relevant pages of the transcript when received.

her to remove her clothing.  The fact that plaintiff Miller was, according to her, unclothed when the female officer searched her does not convert an ordinary search into a "strip search." Plaintiff Miller's claim for an illegal "strip search" should be dismissed.

Unlike plaintiff Thomas, plaintiff Miller alleges that she was subjected to a body cavity search.  However, other than plaintiff Miller's allegation that this occurred, there is absolutely no evidence which supports Miller's claim.  Plaintiff Miller describes the female officer who purportedly improperly searched her as Hispanic, with dark hair, and the only female officer defendant in this case bears no resemblance to such a description.  That is to say that plaintiff Miller cannot prove personal involvement of any of the officer defendants in this case in the alleged illegal strip / body cavity search she alleges.  Equally important, the one piece of evidence plaintiff Miller explicitly claimed to exist in corroboration of her claim – medical records from a visit to the OBGYN – do not in fact exist.  Without at minimum being able to prove personal involvement, or being able to submit admissible evidence which supports her claim, plaintiff Miller's illegal strip search / body cavity search claim must be dismissed.

## POINT V

## PLAINTIFFS' STATE LAW SEXUAL ASSAULT AND BATTERY CLAIMS FAIL

In overbroad and conclusory fashion, plaintiffs allege, against all defendants, claims of sexual assault and battery. [103]  Plaintiffs both allege that defendants, including but not limited to defendant Penner, intended to cause them harmful bodily contact.  Plaintiffs both allege that "defendants" "voluntarily caused" them "physical and garden variety psychological injuries."  Contrary to the claims in the Amended Complaint, however, plaintiff Thomas, at her deposition, admitted to not having any physical, emotional or financial injuries stemming from

---

[103] See Amended Complaint, Docket No. 31, at ¶¶ 22-26.

24

the February 2, 2017 search warrant execution.[104]   Likewise, contrary to the claims in the Amended Complaint, plaintiff Miller, at her deposition, admitted that she is not claiming any physical or mental injuries as a result of the February 2, 2017 search warrant execution.[105] Because there is no evidence to support any of plaintiffs' conclusory claims of sexual assault and battery, and for the reasons set forth above in Point IV <u>supra</u>, summary judgment should be granted in favor of defendants on plaintiffs' state law claims of sexual assault and battery.

**POINT VI**

**PLAINTIFFS' MONELL CLAIM FAILS      **

Plaintiffs' conclusory <u>Monell</u> claim can be found in Paragraph 30 of their Amended Complaint, where they allege that "Defendant City has a policy and/or custom of unlawfully searching persons and property."   Plaintiffs accuse defendant City of having "a pattern and practice of unreasonable searches of persons and property pursuant to <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658."   There is no evidence in this case to support these allegations.  As such, plaintiffs' <u>Monell</u> claim must be dismissed.

---

[104] <u>See</u> Thomas Dep. at 107:22-108:6, Pierre Decl. Exhibit E.
[105] <u>See</u> Miller Dep. at 34:13-25, Pierre Decl. Exhibit G.

## <u>CONCLUSION</u>

For the foregoing reasons, defendants respectfully request that the Court grant their motion for summary judgment together with such costs, fees and other and further relief as the Court deems just and proper.

Dated:          September 6, 2019
                New York, New York


                                    GEORGIA M. PESTANA
                                    Acting Corporation Counsel of the City
                                      of New York
                                    *Attorney for Defendants*
                                    100 Church Street
                                    New York, New York 10007
                                    (212) 356-2415


                            By:     /s/ _____
                                    Lucienne Pierre
                                    Senior Counsel

26