UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――――――――――
KENYA THOMAS, TYANA MILLER,
                             Plaintiffs,

                -v-                                              17-CV-8593 (JPO)

CITY OF NEW YORK *et al.*,                        OPINION AND ORDER
                             Defendants.
―――――――――――――――――――――――――――――――――

J. PAUL OETKEN, District Judge:

Plaintiffs Kenya Thomas and Tyana Miller bring constitutional claims and state sexual assault and battery claims against Defendants City of New York and City of New York Police Department ("NYPD") Officers Bridget Penner, David Cheesewright, Andrew Kamna, and Leonard Clarke, arising from Defendants' execution of a search warrant on February 2, 2017. They challenge both the basis for the search warrant and Defendants' specific acts and omissions as they relate to the search itself. Defendants now move for summary judgment. For the reasons that follow, Defendants' motion is granted in part and denied in part.

**I.     Background**

In January 2017, Defendants Kamna and Clarke reported conducting, under the supervision of Defendant Cheesewright, two controlled buys of heroin and crack cocaine through a confidential informant. (Dkt. No. 57-3; Dkt. No. 57-4.) As reported, the confidential informant went to 60 Moore Street, Apartment 6C, in Brooklyn, New York (the "Apartment"), where he met an individual who sold him heroin on one occasion and crack cocaine on another. (*Id.*) The confidential informant described the seller as "a black male, approximately 5'10" tall, weighing approximately 170 pounds." (Dkt. No. 57-2 at ¶ 3.) Defendant Kamna affirmed that, subsequent to the controlled buys, he conducted a photographic array with the confidential

1

informant.  (Dkt. No. 57-2 ¶ 9.)  From the photographic array, the confidential informant identified as the seller a man who had previously informed the NYPD that he lived at the Apartment.  (Dkt. No. 57-2 ¶ 10.)

On January 27, 2017, Defendant Kamna sought a no-knock search warrant for the Apartment from the Kings County Supreme Court.  (Dkt. No. 57-2 at 4–5.)  He submitted an affidavit recounting the controlled buys and the confidential informant's identification of the seller.  (Dkt. No. 57-2.)  Based on the affidavit, an Acting Justice of the Supreme Court found "probable cause for believing that certain property," including and relating to heroin and crack cocaine, would be found in the Apartment.  (Dkt. No. 57-1.)  The Acting Justice granted the requested no-knock search warrant for the Apartment, as well as a search warrant for the seller. (*Id.*)

On the morning of February 2, 2017, the NYPD, under the supervision of Defendant Cheesewright, executed the search warrant for the Apartment.  (Dkt. No. 56 ¶ 4.)  At the time of the search, Plaintiffs were in the Apartment.  Plaintiff Thomas lived in the Apartment, and Plaintiff Miller was staying with her boyfriend at the time, Ira Thomas.  (Dkt. No. 56 ¶¶ 5, 16.) Plaintiffs testified that they woke up because of the search.  (Dkt. No. 64-3 at 57:16–18; Dkt. No. 64-5 at 40:19–23.)  Upon waking up, Plaintiffs were cuffed behind the back, and Plaintiff Thomas was moved from her private room into her sister's smaller room.  (Dkt. No. 56 ¶ 20; Dkt. No. 64-5 at 75:4–15.)

The NYPD team conducting the search, which included Defendants Cheesewright, Kamna, and Clarke, did not include any female officers.  (Dkt. No. 58 at 1.)  A member of the team called for a female officer to search the women, who were in various states of undress. (*Id.*)  Defendant Penner, who had been assisting a different search taking place at 60 Moore

Street, arrived at the Apartment. (Dkt. No. 64-4 at 6:12–19, 20:5–7.) When testifying, Defendant Penner could not recall what, precisely, she had been instructed to do in the Apartment, but she could recall searching three women. (Dkt. No. 64-4 at 29:19–21, 35: 2–7). She first searched Plaintiff Miller in Ira Thomas's room of the Apartment. (Dkt. No. 64-4 at 52:7–12.) Ira Thomas, who Defendant Penner assumed was Plaintiff Miller's boyfriend, was present for the search. (*Id.*) Defendant Penner then went to a smaller room in the Apartment, where she searched two more women, one of whom, by description, could be Plaintiff Thomas. (Dkt. No. 64-4 at 54:23, 55:24–25.) Plaintiff Thomas testified that she was searched by Defendant Penner in the smaller room. (Dkt. No. 64-5 at 75:8–17, 83:8–9.)

Central to this case, Plaintiffs and Defendant Penner sharply dispute the nature of Defendant Penner's searches. Plaintiff Miller testified that she was fully unclothed when she awoke and during the search. (Dkt. No. 64-3 at 41:3–14; Dkt. No. 63 ¶ 34.) She recounted that Defendant Penner digitally penetrated her twice during the search and also directly contacted and "groped" her breasts. (Dkt. No. 64-3 at 45:1–7.) Plaintiff Thomas testified that she was wearing a short nightgown and no underwear when she awoke and during the search. (Dkt. No. 64-5 at 62:4–9; Dkt. No. 63 ¶ 33). She recounted that Defendant Penner made direct contact with her labia and clitoris during the search. (Dkt. No. 64-5 at 86:6–9.) In contrast, Defendant Penner recalled all of the women in the Apartment being clothed when she conducted her searches. (Dkt. No. 64-4 at 46:6–18, 56:2–4.) Defendant Penner stated that she would "absolutely not" have searched underneath the clothes the women were wearing. (Dkt. No. 64-4 at 62:6–7.)

In addition to Defendant Penner's searches of the women, the NYPD team searched the Apartment. Plaintiff Miller recalled watching members of the team search Ira Thomas's room and testified that the officers "didn't destroy anything" during their search. (Dkt. No. 64-3 at

3

44:6–11, 53:17–20.) Plaintiff Thomas did not witness the search of her room but testified that the dresser and television in her room were "damaged" during the search. (Dkt. No. 64-5 at 109:6.) Based on his written records and personal recollection of the search, Defendant Kamna estimated that the search of the Apartment took two and a half hours altogether. (Dkt. No. 64-1 at 37:23–25, 38:4–6.) Similarly, Plaintiff Miller estimated that the NYPD left after roughly two hours. (Dkt. No. 56 ¶ 19.) Plaintiff Thomas recalled the search lasting four hours. (Dkt. No. 56 ¶ 12.)

On November 7, 2017, Plaintiffs brought this action against Defendants, in relation to the events of the February 2, 2017 search. (Dkt. No. 1.) In their original complaint, Plaintiffs claimed that they had been subjected to an unlawful search of the Apartment and of their persons, in violation of the Fourth and Fourteenth Amendments, and to sexual assault and battery, in violation of New York law. (Dkt. No. 1 at 5–9.) These claims were reiterated in Plaintiffs' amended complaint, which was filed on October 31, 2018. (Dkt. 31 at 7–10.) On September 6, 2019, Defendants moved for summary judgment on all claims. (Dkt. No. 55.)

## II.     Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense." *Cohen Lans LLP v. Naseman*, No. 14-cv-4045, 2017 WL 477775, at *3 (S.D.N.Y. Feb. 3, 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific

4

facts demonstrating a genuine issue for trial, *i.e.*, that reasonable jurors could differ about the evidence." *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.*, No. 12-cv-5262, 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014). The Court must view all evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in its favor," and summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir. 1995) (internal quotation marks and citations omitted).

**III.    Discussion**

In their motion for summary judgment, Defendants argue that Plaintiffs' claims fail because (1) the search of the Apartment was done pursuant to a valid search warrant and was conducted reasonably; (2) Defendants Cheesewright, Kamna, and Clarke were not personally involved in the searches of Plaintiffs; (3) Defendant Penner did not subject either Plaintiff to a strip search or body cavity search; (4) similarly, Defendant Penner did not subject either Plaintiff to sexual assault and battery; and (5) Plaintiffs have adduced no evidence that Defendant City of New York has a policy or custom of conducting unlawful searchers. (Dkt. No. 58.) The Court addresses each of these arguments. The search of the Apartment and searches of Plaintiffs are discussed in turn. The personal involvement of the male defendants is assessed in the context of each search. The liability of Defendant City of New York is then addressed.

    **A.    Plaintiffs' Claims Regarding the Search of the Apartment**

        **1.    The Search Warrant**

In claiming that the search of the Apartment violated the Fourth and Fourteenth Amendments, Plaintiffs first call into question the validity of the January 27, 2017 search warrant. (Dkt. No. 62 at 9.) They suggest that Defendant Kamna's lack of "recollection of any

5

event leading up to the search of the [Apartment], including the controlled buys, the confidential informant [] utilized, [and] whether he was ever present at the location prior to February 2, 2017," undermines the substance of Defendant Kamna's search warrant affidavit. (Dkt. No. 62 at 8.) Without specific testimony to support the affidavit, Plaintiffs contend, a "jury should be permitted to decide whether the warrant was properly obtained." (Dkt. No. 62 at 9.)

Plaintiffs misplace the burden of proof. As Defendants point out, "[a] search warrant affidavit is presumed reliable." *United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008). To void a warrant, a party must demonstrate "that there were . . . material misstatements or omissions in the search warrant affidavit." *Id*. The party must show that such misstatements or omissions were made "knowingly and deliberately, or with a reckless disregard of the truth." *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994). "Unsupported conclusory allegations of falsehood or material omission cannot support" a challenge to a search warrant affidavit and its resulting search warrant. *Id*.

In their amended complaint, Plaintiffs alleged that "Defendants misled the [Kings County Supreme Court] intentionally and/or negligently in that the person wanted had not resided in the subject apartment for several years." (Dkt. No. 31 at 31.) This is the only supposed falsehood or omission that Plaintiffs identify. Plaintiffs, however, have adduced no evidence to support their allegation that the seller described in Defendant Kamna's search warrant affidavit had moved out of the Apartment years earlier. (*See generally* Dkt. No. 63.) Nor have Plaintiffs adduced any evidence suggesting that Defendants knew or should have known that the seller had moved. (*Id*.) Irrespective of the seller's address, Plaintiffs have provided no evidence to rebut that two controlled buys actually occurred at the Apartment in January 2017. (Dkt. No. 56 ¶ 3; Dkt. No. 63 ¶ 3.) In other words, Plaintiffs present nothing with which to "challenge the truthfulness of

the factual statements made in the affidavit." *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003) (citations omitted). Accordingly, there are no triable issues of fact with respect to the search warrant, which is presumed valid.

### 2. The Search of the Apartment, in General

Plaintiffs also challenge whether Defendants searched the Apartment in a reasonable manner. They highlight that the search lasted an "unreasonable four hours," Plaintiff Thomas's furniture was damaged during the search, Defendants had their guns drawn when securing the Apartment, and Plaintiffs were cuffed throughout the search. (Dkt. No. 62 at 9–11.) Plaintiffs are correct that the Fourth Amendment "applies not only to prevent searches and seizures that would be unreasonable if conducted at all, but also to ensure reasonableness in the manner and scope of searches and seizures . . . that are carried out . . . pursuant to a warrant." *Ayeni v. Mottola*, 35 F.3d 680, 684 (2d Cir. 1994), *abrogated on other grounds by Wilson v. Layne*, 526 U.S. 603 (1999). But the facts highlighted by Plaintiffs do not suggest that Defendants acted unreasonably in conducting their search.

First, Plaintiffs' cited case, *Hollins v. City of New York* (Dkt. No. 62 at 10), does not stand for the proposition that a four-hour search of an apartment may be unreasonable, based on the duration of the search. No. 10-cv-1650, 2014 WL 836950 (S.D.N.Y. Mar. 3, 2014). Instead, the court in *Hollins* concluded that the detention of an apartment's occupant may be "excessively long," and thus an unreasonable seizure, if the record suggests that the occupant was handcuffed for "more than three hours and possibly more than four hours," including "an additional hour" after the end of the search. *Id.* at *7. Plaintiffs cite no case law to support their insinuation that a four-hour search, pursuant to a search warrant for drugs, is reasonable only if an "apartment [i]s unkempt or otherwise difficult to search." (Dkt. 62 at 10.) To the contrary, courts have rejected

7

challenges to the reasonableness of searches, and incidental seizures, lasting several hours, with no regard to the state of the location prior to the search. *See Lynch ex rel. Lynch v. City of Mt. Vernon*, 567 F. Supp. 2d 459, 469 & n.6 (S.D.N.Y. 2008) (referring to the plaintiff's "conclusory assertion that the [three-hour] search lasted an unreasonably long time" as "completely unpersuasive").

Second, the law recognizes that "officers executing search warrants on occasion must damage property in order to perform their duty." *Dalia v. United States*, 441 U.S. 238, 259 (1979). Plaintiff Miller witnessed no damage to the property in Ira Thomas's room, and Plaintiff Thomas testified that the damage to her dresser, the misalignment of the rollers of several drawers, cost $100 to repair. (Dkt. No. 64-5 at 110:3–21.) Plaintiff Thomas testified that Defendants cracked her television screen, but she has provided no documentary evidence of the damage. (Dkt. No. 64-5 at 110:1–2; Dkt. No. 56 ¶¶ 9–11.) This is not the kind of "[e]xcessive or unnecessary destruction" that implicates the Fourth Amendment. *United States v. Ramirez*, 523 U.S. 65, 71 (1998); *see also Soichet v. Toracinta*, 111 F.3d 124, 1997 WL 183776, at *3 (2d Cir. 1997) (table opinion) (affirming a grant of summary judgment despite the plaintiff's "conclusory allegations" that government agents unreasonably "ransacked" her apartment, "destroyed antique furniture," and damaged a phone cord).

Third, "[i]n executing a search warrant for drugs, as in this case, it is reasonable for police officers to enter a residence with guns drawn to secure the area." *Bolden v. Village of Monticello*, 334 F. Supp. 2d 407, 419 (S.D.N.Y. 2004); *see also Green v. City of Mt. Vernon*, 96 F. Supp. 3d 263, 296 (S.D.N.Y. 2015) (collecting cases). Fourth and finally, because Defendants were executing a search warrant for drugs, their use of handcuffs on Plaintiffs was a reasonable measure for "minimiz[ing] the risk of harm" or violence and preventing any "efforts to conceal

or destroy evidence." *Muehler v. Mena*, 544 U.S. 93, 98–100 (2005) (citing *Michigan v. Summers*, 452 U.S. 692, 702 (1981)).

Plaintiffs have not identified anything in the record suggesting that Defendants' search of the Apartment, in general, was unreasonable and in violation of the Fourth Amendment. (*See generally* Dkt. No. 63.) Furthermore, "[b]efore any due process liability can be imposed for property damage occurring in a lawful search, it must be established that the police acted unreasonably or maliciously in bringing about the damage." *Cody v. Mello*, 59 F.3d 13, 16 (2d Cir. 1995). Plaintiffs have not alleged, let alone marshaled evidence to suggest, that Defendants acted maliciously, thereby working the kind of "deprivation of property" that implicates the Due Process Clause. (Dkt. No. 31 at 10.) Accordingly, Defendants are entitled to summary judgment on Plaintiffs' Fourth Amendment and Due Process claims regarding Defendants' search of the Apartment as a general matter.

### 3. The Search of Ira Thomas's Room

Plaintiff Miller testified that she was fully unclothed when the NYPD arrived at the Apartment. (Dkt. No. 64-3 at 41:3–14.) Furthermore, she testified that an officer "pulled [a] blanket" from her body, cuffed her behind the back, and told her to stand in the nude. (Dkt. No. 64-3 at 41:3–11.) She estimated that she stood, waiting for a female officer, for "[m]aybe five to ten minutes." (Dkt. No. 64-3 at 43:6.) This specific interaction may have constituted an unreasonable search and presents triable issues of fact.

In *Los Angeles County, California v. Rettele*, the Supreme Court suggested that a search would have violated the Fourth Amendment had the defendants "prevented [the unclothed plaintiffs] from dressing longer than necessary to protect [the officers'] safety." 550 U.S. 609, 615 (2007). In that case, the plaintiffs were unclothed for two to three minutes. *Id.* Applying

9

*Rettele*, the court in *Brown v. City of New York* assessed that the search at issue may have been unreasonable, and that the defendant-officers were not evidently entitled to qualified immunity, because the plaintiff in *Brown* was detained in the nude for forty minutes. No. 11-cv-1068, 2013 WL 491926, at *7–8 (S.D.N.Y. Feb. 8, 2013). The analysis looks much the same here.

Per her account of the search, Plaintiff Miller was forced to stand in the nude, without any means of covering herself, for a period longer than were the plaintiffs in *Rettele*. Officers prevented Plaintiff Miller from covering herself even as they turned their attention to activities other than securing the Apartment and ensuring officer safety. Plaintiff Miller described that officers searched Ira Thomas's room as she stood waiting for a female officer to arrive (Dkt. No. 64-3 at 44:6–17), and Defendant Kamna understood that Ira Thomas's room "was deemed safe" by the Emergency Service Unit ("ESU") that did an initial sweep of the Apartment. (Dkt. No. 64-1 at 34:4–13; 59:20–25.) Under Plaintiff Miller's recounting of the facts, she may have been detained in the nude for longer than necessary to achieve valid law enforcement purposes.

The record reflects that Defendant Kamna was personally involved in searching Ira Thomas's room. (Dkt. No. 64-1 at 34:4–21.) When asked if Plaintiff Miller "was clothed" at the time he performed the search, Defendant Kamna initially testified that he could not remember. (Dkt. No. 64-1 at 34:25, 35:1.) Even if Defendant Kamna did not himself force Plaintiff Miller to stand in the nude, whether he "had sufficient time to intercede or was capable of preventing the harm . . . [would be] an issue of fact for the jury." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). Furthermore, under Plaintiff Miller's recounting of the facts, Defendant Kamna is not evidently entitled to qualified immunity, which requires that it be "objectively reasonable" for an officer "to believe that his actions were lawful at the time of the challenged act." *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007) (internal quotation marks and citation

omitted).  In light of *Rettele* and *Brown*, as well as Defendant Kamna's understanding that Ira Thomas's room had been secured before his arrival, the Court declines to extend qualified immunity to Defendant Kamna at this juncture.

Plaintiffs have not marshaled evidence to show that Defendants Cheesewright and Clarke were personally involved in working a deprivation of Plaintiff Miller's rights.  *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (internal quotation marks and citation omitted)).  They identify no evidence suggesting that either Defendant Cheesewright or Defendant Clarke knew that Plaintiff Miller was fully unclothed at any point in the search, and Plaintiffs appear to abandon their claims against Defendant Clarke.  (Dkt. No. 62 at 20 (arguing that "Defendants Kamna and Cheesewright are sufficiently personally involved in the constitutional deprivations of February 2, 2017," but making no mention of Defendant Clarke).)  Although a defendant-supervisor's personal involvement may be established by showing that he was "grossly negligent in supervising subordinates who committed [] wrongful acts," *Colon*, 58 F.3d at 873–74 (citation omitted), nothing suggests that Defendant Cheesewright had "reason to know of facts creating a high degree of risk of . . . harm to [Plaintiff Miller] and deliberately act[ed] or fail[ed] to act in conscious disregard or indifference to that risk," *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014) (internal quotation marks and citation omitted) (explaining when a defendant-supervisor meets the "higher degree of culpability" of gross negligence).  Per his testimony, Defendant Cheesewright understood that in "every situation where [a] female [occupant identified in an initial sweep] was not clothed, ESU wrapped her in a blanket or in a sheet."  (Dkt. No. 64-2 at 26:7–10.)  Defendant Cheesewright recalled one conversation with a woman meeting Plaintiff

Miller's description, in which he "spoke to her about giving [the NYPD] information on drug dealers, people with guns," and "[s]he was telling [him] about people that were committing crimes behind the 84 Precinct in the Ingersoll Whitman Houses" and "about a reality TV show she was doing in Atlanta."  (Dkt. No. 64-2 at 10:16–25, 11:1–16.)  He recalled that the conversation took place "[i]n the dining room area," and the woman was clothed.  (*Id.*)  Defendant Cheesewright was not on notice that Plaintiff Miller might be subjected to, or actually was subjected to, five to ten minutes of detention in the nude.

In sum, there is a genuine dispute as to a material fact with respect to the reasonableness of the search of Ira Thomas's room.  Defendant Kamna may bear liability for the search, and the Court denies summary judgment with respect to him.  Defendants Cheesewright and Clarke, however, are entitled to summary judgment on this part of Plaintiffs' claims.

### B. Plaintiffs' Claims Regarding the Searches of Their Person

#### 1. The Search of Plaintiff Miller

Defendants offer two arguments for why Plaintiff Miller's claims regarding Defendant Penner's search must fail.  First, they argue that Plaintiff Miller has not provided credible or consistent testimony.  Second, they argue that Defendants Cheesewright, Kamna, and Clarke were not personally involved in the search.

As a general rule, "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."  *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).  In "rare circumstances," however, "where the plaintiff relies almost exclusively on [her] own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether . . . there are any 'genuine' issues of material fact[] without making some assessment of the plaintiff's account."

*Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005).  Defendants contend that this case presents the rare circumstance in which it would be appropriate to discount a plaintiff's testimony in support of her claims.

Defendants are correct that Plaintiff Miller's testimony has not been uniformly consistent with uncontroverted record evidence or with her own pleadings.  Plaintiff Miller described the officer who searched her as a 5'7" woman of Puerto Rican descent, with black hair.  (Dkt. No. 64-3 at 41:18–23.)  Defendant Penner, by contrast, is a 5'3" non-Hispanic woman of Irish descent, with "dirty blondish" hair.  (Dkt. No. 64-4 at 22:24; Dkt. No. 56 ¶ 25; Dkt. No. 64-5 at 93:16–18).  Plaintiff Miller recounted that the officer who searched her was wearing "regular clothes," contrary to Plaintiff Thomas's and Defendant Penner's recollection that Defendant Penner was in uniform.  (Dkt. No. 56 ¶¶ 23, 26; Dkt. No. 64-5 at 22–23.)  Plaintiff Miller's testimony that the search took two hours stands at odds with the pleadings, in which she alleged that she was "detained for approximately 4 hours."  (Dkt. No. 31 ¶ 12.)  Still, none of these inconsistencies goes to the heart of Plaintiff Miller's claim and creates a "real, unequivocal, and inescapable contradiction" with her pertinent testimony: that a female NYPD officer — who, in retrospect, must have been Defendant Penner — performed a body cavity search on her during the course of the February 2, 2017 search.  *Rivera v. Rochester Genesee Regional Transp. Authority*, 743 F.3d 11, 23 (2d Cir. 2014); *see also Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011) (cautioning district courts not to "engage in searching, skeptical analyses of parties' testimony in opposition to summary judgment").

Only one inconsistency between Plaintiff Miller's testimony, pleadings, and uncontroverted record evidence gives the Court pause.  Specifically, Plaintiff Miller affirmed in her deposition and alleged in the pleadings that she sought treatment after the search from an

13

obstetrician-gynecologist at Woodhull Medical Center.  (Dkt. No. 64-3 at 13:15–17; Dkt. No. 31 ¶ 13.)  Had Plaintiff Miller actually sought such treatment, that fact would be probative of whether she was digitally penetrated during the February 2, 2017 search.  But Woodhull Medical Center denies having records of any visit by Plaintiff Miller on or after February 2, 2017.  (Dkt. No. 57-14.)

Although the discrepancy between Plaintiff Miller's account and Woodhull Medical Center's records may be concerning, it is a far cry from the type and numerosity of discrepancies in cases in which courts have looked past a plaintiff's testimony to grant summary judgment.  *See, e.g., Jeffreys*, 426 F.3d at 552 (noting that the plaintiff, who was alleging that police officers had thrown him out of a third-story window, had in fact "confessed to having jumped out of the third-story window" on three separate occasions); *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 469–70 (S.D.N.Y. 1998) (Sotomayor, J.) (noting that the plaintiff had changed his description of his physical injuries no fewer than four times throughout the litigation and that his descriptions were contrary to his medical records).  Here, Plaintiff Miller's allegations with respect to the body cavity search are not "so contradictory that doubt is cast upon their plausibility."  *Pico*, 994 F. Supp. at 470.  Accordingly, Plaintiff Miller's claim survives Defendants' attack on her credibility.

Summary judgment, however, is warranted as regards Defendants Cheesewright and Clarke.  As discussed, Plaintiffs have adduced no evidence with respect to Defendant Clarke's personal involvement and appear to abandon their claims against him.  Defendant Cheesewright testified that, per his "practice," he would have instructed Defendant Penner to "just pat down the female," and "[i]f the female isn't clothed, search the clothing and have the female get dressed."  (Dkt. No. 64-2 at 24:21–25.)  Defendant Penner testified that she was not given any

"instruction to search body cavities." (Dkt. No. 64-4 at 47:3–6.) Defendants Cheesewright stated his belief that NYPD officers "don't do body cavity searches" (Dkt. No. 64-2 at 21:14), a sentiment separately raised by Defendant Penner, who explained that such searches "ha[ve] to be done with a medical professional." (Dkt. No. 64-4 at 9–15.) Plaintiffs have identified no evidence suggesting that Defendant Cheesewright knew or should have known that Plaintiffs were searched invasively. As with the search of Ira Thomas's room, Defendant Cheesewright was not on notice that Plaintiff Miller might be subjected to, or actually was subjected to, a body cavity search.

The same cannot be said for Defendant Kamna, who testified that he "stayed in [Ira Thomas's] room the whole time, the whole two and a half hours" of the search. (Dkt. No. 64-1 at 43:8–10.) Even if Defendant Kamna did not himself perform a body cavity search of Plaintiff Miller, he could bear liability for his failure to intercede. *See Anderson*, 17 F.3d at 557. Plainly, Defendant Penner also could bear liability for the search. Defendants do not attempt to assert qualified immunity with respect to any body cavity search that may have happened. It follows that summary judgment on Plaintiff Miller's claim regarding the body cavity search must be denied as to Defendants Kamna and Penner but granted as to Defendants Cheesewright and Clarke.

### 2. The Search of Plaintiff Thomas

Defendants present four arguments for why Plaintiff Thomas's claim regarding Defendant Penner's search must fail: (1) although the complaint's first cause of action is labeled "ILLEGAL STRIP SEARCH/BODY CAVITY SEARCH" (Dkt. No. 31 at 7), the search of Plaintiff Thomas did not meet the legal definition of a strip search or body cavity search; (2) courts routinely grant summary judgment on Fourth Amendment claims based on brief contact

15

with an individual's breasts or genitals; (3) Plaintiff Thomas has not provided credible or consistent testimony; and (4) Defendants Cheesewright, Kamna, and Clarke were not personally involved in the search.

The first and second arguments are plainly meritless. The Court is not inclined to quibble over how Plaintiff Thomas chose to style her complaint when the gravamen of her claim is clear: that Defendants' search of her person was unreasonable and a violation of her constitutional rights. Defendants' own case law acknowledges that the search of a person can be conducted in an unreasonable manner, even if the search is neither a strip search nor a body cavity search. *See, e.g., Scalpi v. Amorim*, No. 14-cv-2126, 2018 WL 1606002, at *19 (S.D.N.Y. Mar. 29, 2018). Furthermore, the cases that Defendants cite to argue that Plaintiff Thomas experienced "a standard search that has repeatedly been upheld as reasonable" involve materially different circumstances from those at issue here. (Dkt. No. 58 at 20.) In *Scalpi v. Amorim*, the court emphasized that the searching officer "touched Plaintiff's breasts over Plaintiff's shirt" and "touched Plaintiff's genital area . . . over her pants." 2018 WL 1606002, at *18. The *Scalpi* court collected a litany of cases involving *over-the-clothing* searches to establish that such searches, without more, are "insufficient to violate the Fourth Amendment." *Id*. And in *Wang v. Vahldieck*, the court found no violation from the plaintiff's testimony that the defendant made skin-to-skin contact with her because the plaintiff did not allege that she was touched on her breasts or genitals. No. 09-cv-3783, 2012 WL 119591, at *10 (E.D.N.Y. Jan. 9, 2012) ("[A]t the very most, defendant touched plaintiff's skin on some unspecified portion of her body."). Defendants neglect to mention cases like *Murray v. New York*, in which the court treated the plaintiff's allegation that a state trooper "'groped' [his] genitals . . . under his clothing" as "sufficient to proceed" with a Fourth Amendment claim. No. 19-cv-6453, 2020 WL 529279, at

16

\*3 (W.D.N.Y. Feb. 3, 2020).  As in *Murray*, Plaintiff Thomas's claim involves the skin-to-skin touching of her genitals, which would be actionable as an unreasonable search.

With respect to Defendants' third argument, Plaintiff Thomas, like Plaintiff Miller, has at times given inconsistent testimony.  The only inconsistency that bears meaningfully on her claim, however, regards what Plaintiff Thomas was wearing when she awoke and at the time of her search.  In her complaint, Plaintiff Thomas alleged that she "did not have any clothes on" when the NYPD first entered the Apartment.  (Dkt. No. 31 ¶ 9.)  She alleged that NYPD officers told her "she could not get dressed" and that she was fully unclothed during the search of her person.  (*Id.*)  During her deposition, Plaintiff Thomas's account shifted, and she testified that she was wearing a nightgown when the NYPD entered the Apartment and when she was searched.  (Dkt. No. 64-5 at 62:4–9; Dkt. No. 63 ¶ 33).  What Plaintiff Thomas was wearing at the time of the search is of particular importance to her claim; Defendant Penner testified that the woman matching Plaintiff Thomas's description was fully clothed and that Defendant Penner did not search under her clothing. (Dkt. No. 64-4 at 46:6–18, 56:2–4, 62:6–7.)  Ultimately, the inconsistency between Plaintiff Thomas's allegations and her testimony is concerning but does not warrant a grant of summary judgment.  Under either of her accounts, Plaintiff Thomas was not wearing underwear at the time of her search, and Defendant Penner could have made direct contact with her genitals without lifting or asking Plaintiff Thomas to remove any clothing.  The credibility of Plaintiff Thomas's testimony is a matter for the jury to decide.

Still, Defendants' arguments succeed in one regard: Plaintiffs have not adduced any evidence that Defendants Cheesewright, Kamna, and Clarke were personally involved in the search of Plaintiff Thomas.  The male defendants are therefore entitled to summary judgment on Plaintiff Thomas's claim regarding the search of her person.

### C. Plaintiffs' Sexual Assault and Battery Claims

"Assault and battery claims under New York law and Fourth Amendment . . . claims are evaluated pursuant to the same standard." *Feaster v. City of Middletown*, No. 16-cv-734, 2016 WL 10570984, at *3 (S.D.N.Y. Nov. 28, 2016) (citing *Cosby v. City of White Plains, NY*, No. 04-cv-5829, 2007 WL 853203, at *6 (S.D.N.Y. Feb. 9, 2007)). Courts measure both claims "against a standard of 'objective reasonableness,' which calls for a 'careful balancing of the nature and quality of the intrusion on the individual's . . . interests against the countervailing governmental interests at stake.'" *Antic v. City of New York*, 273 F. Supp. 3d 445, 458 (S.D.N.Y. 2017) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Because Plaintiffs' constitutional claims regarding Defendant Penner's searches survive summary judgment, so too must the sexual assault and battery claims. Contrary to Defendants' suggestion, Plaintiffs do assert injuries in relation to these claims. (Dkt. No. 63 ¶¶ 15, 21.)

### D. Plaintiffs' Claims Against the City

To hold Defendant City of New York liable for violations of Plaintiffs' constitutional rights, Plaintiffs must show "(1) an official policy or custom that (2) cause[d] [them] to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (citation omitted). Plaintiffs alleged that Defendant City of New York "has a policy and/or custom of unlawfully searching persons and property" (Dkt. No. 31 ¶ 30), but they have adduced no evidence to support this allegation. (*See generally* Dkt. No. 63.) Perhaps recognizing this, Plaintiffs make no effort to defend against Defendants' motion for summary judgment insofar as it relates to Defendant City of New York. Defendant City of New York is entitled to summary judgment.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

The parties are directed to confer and to file a joint letter within 21 days after the date of this Opinion and Order.  The joint letter shall address (1) potential jury trial dates, or bench trial dates if all parties consent to a bench trial, between April 2021 and September 2021, (2) the parties' estimated length of trial (in number of days), and (3) whether all parties agree to be referred to Magistrate Judge Katharine Parker for a settlement conference.

The Clerk of Court is directed to close the motion at Docket Number 55.

SO ORDERED.

Dated: November 16, 2020
       New York, New York

_____
J. PAUL OETKEN
United States District Judge