M963MIL1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    KENYA THOMAS, TYANA MILLER,

4                    Plaintiffs,

5         v.                              17 Civ. 8593 (JPO)

6    CITY OF NEW YORK, *et al*,

7                    Defendants.          Trial

8    ------------------------------x
                                         New York, N.Y.
9                                        September 6, 2022
                                         10:00 a.m.
10
     Before:
11
                       HON. J. PAUL OETKEN,
12
                                         District Judge
13
                             APPEARANCES
14
     LAW OFFICE OF ALEXIS G. PADILLA
15        Attorneys for Plaintiffs
     BY:  ALEXIS G. PADILLA
16        -AND-
     LAW OFFICE OF DAVID A. ZELMAN
17   BY:  DAVID A. ZELMAN

18

19   NEW YORK CITY LAW DEPARTMENT
          Attorneys for Defendants
     BY:  CHRISTOPHER G. ARKO
20        GREGORY J. O. ACCARINO

21

22

23

24

25

M963MIL1

1                    (In open court)

2            THE DEPUTY CLERK:  In the matter of Tyana Miller and

3     Kenya Thomas v. the City of New York.

4            MR. ZELMAN:  Good morning.  David Zelman for the

5     plaintiff.

6            THE COURT:  Good morning.

7            MR. PADILLA:  Alexis Padilla for the plaintiffs Tyana

8     Miller and Kenya Thomas.

9            THE COURT:  Good morning.

10           MR. ARKO:  Good morning.  Christopher Arko, New York

11    City Law Department for defendant Bridget Penner and Andrew

12    Kamna.

13           MR. ACCARINO:  And Gregory Accarino, assistant

14    corporation counsel.

15           THE COURT:  As of today, masks are no longer required

16    in the public areas of the courthouse.  You can take your masks

17    off if you want.  If you wish to keep your masks on, you may.

18    But, this will be the first trial in two and a half years where

19    the jury will not have to wear masks during the trial, during

20    voir dire and the trial.  It's up to the judges from today

21    going forward to decide whether they are going to require

22    people in the public spaces, their own courtrooms, to wear

23    masks or not.  I'm not going to require masks, but people are

24    welcome to wear masks if they want.  But the jury will be able

25    to take off their masks.

M963MIL1

1          So we're here today for jury selection and trial in

2   this case which has been adjourned multiple times, and I

3   understand from Mr. Hampton that he received an e-mail from

4   Mr. Zelman and then from Mr. Arko about Ms. Miller.

5          MR. ZELMAN:  Yes, your Honor.  Just want to first

6   start off by saying, I was very happy to hear about the masks.

7   I only learned about this secondhand, so I am going to let

8   Mr. Padilla address this issue.

9          THE COURT:  Can you do me a favor and pull the mic

10  close.

11          MR. PADILLA:  Sure.  I'm in contact with my client

12  right now.  She is at Brooklyn Hospital Center, downtown

13  Brooklyn.  She is momentarily going to have a tooth removed

14  from her mouth.

15          I spoke with her twice this weekend in preparing for

16  trial.  Both times she mentioned to me she suffered from a

17  toothache.  She didn't say anything about having to go to the

18  hospital for it, but she mentioned it to me.

19          She called me last night late after I already gone to

20  bed, I saw the missed call this morning, and this morning she

21  texted me to say she'd gone into the hospital to have the tooth

22  removed.  She just texted me, I was actually in the process of

23  sending to the Court a photo of the intake document from

24  Brooklyn Hospital that is dated 9/6 at 5:43 a.m.

25          THE COURT:  It's Brooklyn Hospital?

M963MIL1

1          MR. PADILLA:  She's at Brooklyn Hospital.  And it

2    appears she is going to have a tooth removed.

3          So, what we are asking for is a 24-hour adjournment so

4    that she can be here and in proper condition to testify.  I was

5    planning on having her testify today.  I don't feel comfortable

6    having her testify.  I am assuming she is going to be given

7    anesthesia of some sort before this tooth is removed.  I'm not

8    sure what level, what condition she is going to be in when she

9    comes out of the procedure in terms of being able to speak

10   clearly to the jury, or even to just sit for the time that it

11   will take to go through her direct examination.

12         If the Court were inclined to do jury selection today,

13   I would not object to doing that without her.  But, I don't see

14   how we can move forward with her as a witness today where she's

15   had anesthesia and she's had to sit for this procedure.  I just

16   think she needs 24 hours if the Court is willing.

17         THE COURT:  Okay.  What if we did jury selection and

18   openings today, and then start with witnesses tomorrow?

19         MR. PADILLA:  I would like to have her present for my

20   opening if possible.  Obviously she doesn't need to be here for

21   it, but I would like for the jury to see her, know who I'm

22   talking about, and for her to hear it, what the openings are.

23         THE COURT:  Okay.  Mr. Zelman, anything you want to

24   add?

25         MR. ZELMAN:  No, your Honor.

M963MIL1

1          THE COURT:  Mr. Arko.

2          MR. ARKO:  Your Honor, we do object to any

3    postponement of the trial.  There is no reason why we can't

4    pick a jury today, do opening statements, and even call any one

5    of the other four parties there are in this case.  This has

6    been adjourned for 13 months.

7          So, I think we should do as much as we can today to

8    get as far as along as we can, so we are not wasting time.  We

9    spent the entire weekend preparing for trial.  It should be

10   over by Thursday.  I strongly would urge the Court to do as

11   much as we can today, jury selection, opening statements, and

12   at least one of the witnesses we can get called today.

13         If Mr. Padilla is concerned about his client not being

14   here, certainly the Court can give some explanation that she is

15   not here because of an emergency through no fault of her own

16   and the jury should not draw any conclusions from the fact she

17   is not at the table today.  I think that would address any

18   concerns there may be and we can get as much done today as

19   possible without wasting any time.

20         THE COURT:  Do you want to add anything?

21         MR. PADILLA:  Just I feel my client has a right to

22   participate in a trial, to be here, to be present, to see

23   what's going on.  She's not absent through any fault of her

24   own.  This wasn't something that she could have avoided or

25   planned for ahead of time.  Things happen.

M963MIL1

```
 1              MR. ZELMAN:  I would just add, your Honor, I think
 2    even the plaintiffs are more anxious to proceed with the case
 3    than defense counsel.  We have also had this case adjourned
 4    many times.  And we are in the same position as them as far as
 5    desire to move forward with the case.  It is just a question of
 6    weighing the equities here, about what your Honor feels is the
 7    best thing to do.
 8              THE COURT:  If we started witnesses, first of all,
 9    let's go back.  Openings.  How long do you expect for openings?
10    Are you going to do the opening?
11              MR. PADILLA:  I am.
12              THE COURT:  For both plaintiffs?
13              MR. PADILLA:  Brief, very brief.
14              THE COURT:  How long do you think?
15              MR. PADILLA:  Less than 10 minutes.
16              THE COURT:  Defense openings?
17              MR. ACCARINO:  Yes, your Honor.  Between 10 and 15
18    minutes.
19              THE COURT:  So that's not a long time.  Then once we
20    start witnesses, I am assuming we are going to have two
21    witnesses for the plaintiffs and two for the defendant.  Is
22    that right?
23              MR. ZELMAN:  I think so.
24              MR. ARKO:  My understanding that the plaintiffs are
25    going to call the defendants.  So in that case, we have the two
```

M963MIL1

1    defendants and one custodian of records in total that we need

2    to at least have testify to present our case, whether they're

3    called on plaintiffs' case or not.

4              THE COURT:  You won't need to recall the defendants.

5              MR. ARKO:  I don't expect to, no.

6              THE COURT:  What's your best estimate of, once the

7    testimony starts, what do you think?  One day, two days?

8              MR. PADILLA:  I see the afternoon today, if Ms. Miller

9    were here, I would say we get through all four witnesses for

10   plaintiff in the afternoon and the morning.  So today and

11   tomorrow morning.

12             THE COURT:  All four witnesses?

13             MR. PADILLA:  I would say more likely, yeah.

14             MR. ZELMAN:  One other point I'd like to raise.  We

15   asked to introduce Ms. Thomas' medical records.  Defendants

16   object.  I don't know there was ever a ruling specifically on

17   that, although maybe we touched upon it.  But we have the

18   records, defense counsel requested the records from her doctor.

19   They are on our exhibit list.  And I'm raising this point only

20   because if your Honor has -- I think we had a discussion about

21   it.  There is really no genuine concern about authenticity of

22   these records.  However, I don't remember any specific rulings.

23   So there is a possibility of having to call a representative

24   from the doctor's office for Ms. Thomas' doctor, if the

25   authenticity of these records is not admitted.

M963MIL1

1          THE COURT:  You are not talking about the hospital

2     records?

3          MR. ZELMAN:  No.

4          THE COURT:  You are talking about --

5          MR. ZELMAN:  Medical records from a known doctor by

6     Ms. Thomas here.

7          THE COURT:  I don't remember that coming up in the

8     motions in limine.

9          MR. ZELMAN:  Right.  So we did it on the JPTO, they

10    objected on the JPTO.  But I think that there was a brief

11    discussion about whether or not the defense counsel really

12    objected to the authenticity of it, and then it was not

13    specifically ruled upon.  So...

14          THE COURT:  What's the purpose of the medical records?

15          MR. ZELMAN:  The medical records demonstrate that

16    Ms. Thomas was concerned about what happened on that night,

17    2017.  She did treat with her doctor for it.  She also was

18    complaining about heart palpitations, she was complaining about

19    when she saw officers, she was getting very anxious.  So she

20    went to the doctor, there's medical records to show she went to

21    the doctor.  It is like six or seven pages from the doctor.

22          We provided authorization for those records, defense

23    counsel were able to obtain those records from the doctor's

24    office as I understand it, and then proceeded to object to

25    those records on the JPTO.

M963MIL1

1          THE COURT:  Mr. Arko.

2          MR. ARKO:  We did not receive the medical records from

3  Dr. Gold.  We got -- I went back and reviewed the file.  We

4  attempted to get them from her, but her office wouldn't release

5  them without our paying for them first, and she couldn't fill

6  out a tax form that our fiscal office needed to obtain them.

7  So we were never able to get them directly from her.

8          At some point in discovery, Mr. Zelman produced to us

9  uncertified records that he says are from Dr. Gold.  There is

10  no certification, we did not get them directly from her office.

11  We don't have any context as to where they came from.  We don't

12  know what attachments may be missing from them.

13          We don't consent to them coming in without some

14  authentication.  We made that objection on the JPTO.

15          We are calling a custodian of records we gave notice

16  of to authenticate the letter from Woodhull Hospital that there

17  are no medical records for Tyana Miller.  Couldn't reach a

18  stipulation about that, so we have a live witness coming in to

19  do that.  And we are not going to stipulate to these medical

20  records which are not certified, we did not get from the health

21  care provider directly coming in, and there was no witness that

22  plaintiff gave notice of in the JPTO to authenticate them.  We

23  had objections on both hearsay and authenticity grounds, and

24  they haven't given any notice that they wanted to call

25  witnesses.

M963MIL1

1          THE COURT:  So you want to call a witness?

2          MR. ZELMAN:  Well, do we want to call a witness?  No.

3   But, I just would like to add, your Honor, that this is the

4   first time I'm hearing from defense counsel he had any trouble

5   getting these records from Dr. Gold.  Dr. Gold has an

6   established practice.  I didn't have to fill out any tax forms.

7   I have no idea what he is talking about.  It's paying the

8   amount of money for seven pages, they send the records.

9          I always provide defense counsel as a courtesy copy

10  with a copy, but I never heard once from them that I can recall

11  that they were having any trouble getting this from Dr. Gold

12  herself.  And I think this just trial by sabotage.  There is

13  really no genuine concern about authenticity, but, if again, we

14  would, I would be in a pickle so to speak if I had to call

15  Dr. Gold's office to ask her to bring a representative to say,

16  okay, this is Kenya Thomas' medical records from her visits

17  here.  It is a foregone conclusion.

18         Maybe, your Honor, if your Honor would prefer to go

19  that way, maybe we can do it via telephone, to save them the

20  trouble of having to come here to authenticate the records.

21  But, again, I think this is just literally a trial by ambush,

22  the fact that defense counsel never raised this issue.

23         THE COURT:  They objected in the JPTO, so you all

24  could have talked about this.

25         MR. ARKO:  If I may just say, I know Lucienne Pierre

M963MIL1

1    e-mailed Mr. Zelman about this issue, and I believe it was

2    discussed in the July 2, 2019 post-discovery conference.  I

3    have the transcript of it.  This is not something Mr. Zelman

4    didn't know about.

5              THE COURT:  Unless you can show me these are

6    self-authenticating under the rules, you will need to call

7    somebody to authenticate since they don't agree.  Those are the

8    rules.  You can't have a witness by phone.  I can probably let

9    you bring in a witness.

10             MR. ZELMAN:  Could it be done by Zoom?

11             THE COURT:  No.

12             That's all going back to the scheduling issues I raise

13   to say there might be another witness for a very brief period

14   of time.

15             Still, it seems to me that we could put off openings

16   to tomorrow, or at least we can sort of wait and see how long

17   jury selection takes today.

18             Why don't we go forward with jury selection and see

19   where we are, and get an update from Ms. Miller on where things

20   are.

21             I do need some authentication.

22             MR. PADILLA:  I sent the intake document to

23   Mr. Hampton as well as to Mr. Arko.

24             THE COURT:  Thank you.  So, we'll go forward with jury

25   selection this morning, since it sounds like everyone is all

M963MIL1

1   right with that.  You received my order hopefully on Friday

2   about how I am going to characterize what's in and out of the

3   case.  That should be fairly straightforward.  If anyone has

4   any objections to it, you can put them on the record now.

5        MR. ARKO:  Only one word on that we would like to

6   address with the Court.  I just need to flip to it.

7        MR. ZELMAN:  If I may ask what are you referring to

8   here?

9        THE COURT:  The order I put out on Friday saying this

10  is what I intend to read to the jury.

11       MR. ZELMAN:  Right.

12       THE COURT:  We've been talking about as a stipulation.

13  Since there is no stipulation, it is my description of what is

14  not in issue and what is in issue in the trial.

15       MR. PADILLA:  For plaintiff I have no objection to

16  what I read on ECF assuming the Court will read that verbatim.

17       THE COURT:  Yes, unless they want me to change

18  something.

19       MR. ARKO:  The only thing we would like to address is

20  the word "briefly."  The stipulation reads, "the search warrant

21  carried with it the lawful authority to briefly detain any

22  person found inside the apartment."

23       We would ask the word "briefly" be taken out.  My

24  understanding is there is no time limitation on how long the

25  officers can detain somebody while conducting a search.  There

M963MIL1

1    is no false arrest claim or unlawful detention claim here, and

2    I want to make sure there is no speculation or suggestion to

3    the jury that these plaintiffs should have been released from

4    handcuffs or allowed to freely walk about the apartment after

5    they had been briefly detained in the search.  That's the only

6    concern we have there.

7          THE COURT:  Well, it is a fair point.  "Briefly" is an

8    indeterminate word anyway.  Maybe it's more accurate to say

9    "may be detained for a reasonable period of time sufficient to

10   complete the search" or something like that.

11         MR. ARKO:  We would have no objection to that.

12         MR. ZELMAN:  Judge, how about just a reasonable period

13   of time?

14         THE COURT:  How about a reasonable period of time?

15         MR. ARKO:  No objection to that.

16         THE COURT:  We'll go with that.  You said you are okay

17   with that, Mr. Padilla?

18         MR. PADILLA:  Yes, your Honor.

19         THE COURT:  Great.  We'll go with that.  I want to

20   make sure I am saying your name right.  Padilla?

21         MR. PADILLA:  Yes, your Honor.  Thank you.

22         THE COURT:  I also read the parties' submissions about

23   strip search, which is an interesting and tricky legal issue

24   and I spent some time reading about a bunch of cases on it, and

25   I read the parties' letters.

M963MIL1

1          There are a bunch of cases that do characterize a

2     strip search as the way defendants do, the ones they cite,

3     saying a strip search is when an officer directs someone to

4     remove their clothes.  But there are also a line of cases that

5     refer to it, as Mr. Zelman's cases exemplify, where a strip

6     search is searching someone when they're naked.  So, it's

7     extremely hard to find cases in this scenario where someone is

8     already alleged to be in the nude and is allegedly searched in

9     the nude.  The way I read the cases, I think if someone -- and

10    there is a bunch of cases.  I won't cite them.  But there are

11    actually cases including the Supreme Court's decision in

12    *Florence v. Board of Chosen Freeholders* that talk about the

13    ambiguity of the term strip search.  And there are cases like

14    the *Kelsey* case in the Second Circuit saying briefly or

15    incidentally seeing someone naked during a clothing exchange is

16    not a strip search.

17         The way I rationalize the cases, if someone is already

18    naked and a search is being conducted, there is a reasonable

19    period of time when someone, when an officer can detain the

20    person to ensure that a search is conducted.  But if someone is

21    required to be naked during that detention for what is longer

22    than a reasonable period of time for valid law enforcement

23    purposes, like officer safety, then it becomes an unreasonable

24    search, and I think at that point it becomes a strip search.

25         So I think there are circumstances where someone is

M963MIL1

1    detained and is already naked and is required to stay naked for

2    longer than a reasonable period of time, it does become a strip

3    search.  So I won't preclude plaintiffs from using the phrase

4    strip search, and then we'll see how the testimony comes out.

5        MR. PADILLA:  I'm sorry.  May I interrupt?  May I have

6    permission to inform my client that she doesn't need to come in

7    once her procedure is done?

8        THE COURT:  Well, it depends.  If she's feeling great,

9    she should probably come in.

10       MR. PADILLA:  I doubt she will be feeling great as

11   she's getting her tooth pulled.

12       THE COURT:  She's definitely getting her tooth pulled?

13       MR. PADILLA:  Her last text to me is as soon as she's

14   done, she is going to get in a cab and come here.  What I'd

15   like to tell her is don't worry, go home, rest, come back

16   tomorrow.

17       THE COURT:  But can you confirm that she actually got

18   the tooth pulled as opposed to something else?  What if she

19   goes in and they say, oh, you're fine.

20       MR. PADILLA:  Sure.

21       THE COURT:  I don't want to close off the possibility,

22   unless she's actually under anesthesia or something and isn't

23   feeling well, if she is able to go forward, we should go

24   forward.

25       MR. PADILLA:  Right.  But I don't think she realizes

M963MIL1

1   how she'll feel when she comes out after being anesthetized and

2   having a tooth pulled.  My concern is she won't be clear in her

3   enunciation when she testifies.  Her mouth will be swollen.

4           THE COURT:  Have you confirmed she will be

5   anesthetized?

6           MR. PADILLA:  I haven't.  I am assuming that because

7   she is having a tooth pulled.  But her last text to me was, in

8   her words, "they going to numb it."  They're going to numb it.

9   So she's confirming to me she is going to be put under

10  anesthesia.

11          THE COURT:  It could be Novocaine.  That wears off in

12  a hour or two.

13          It depends.  If it turns out to be a minor thing and

14  she is feeling better and the Novocaine has worn off, she

15  should come in.  Then you could do your openings.

16          MR. PADILLA:  Of course.  Okay.

17          THE COURT:  If she is really feeling badly, then I'm

18  not going to be a jerk about it.

19          MR. ZELMAN:  On that strip search issue, I understand

20  your Honor's ruling and I just would point out that I think if

21  police officers decide to search someone who is naked, that

22  that already at the commencement of it is a strip search

23  because they're naked in the first place.  If you think about

24  it, the purpose of a strip search is to remove the clothing so

25  the officers can see that person naked.  So, if the officers

M963MIL1

see someone's naked and then decide to search them, that
decision, right there in that commencement of the search, I
would argue is a strip search right then and there.

I understand your Honor's ruling, I understand the
case law that you cited, and I wanted to state that's our
position, that this was a strip search as soon as it was
commenced because of the lack of attire that the plaintiffs
were wearing.

THE COURT:  I understand that.  But, the case law also
makes clear an incidental observation of someone who is naked
is not a strip search.  And in a situation where officers have
a search warrant, they have the right to come in and they have
the right to detain people during the search.  If they say "get
out of bed" and the person gets up and they're naked at that
moment, it's not a strip search.  At that moment it is an
incidental viewing of a nude person.  If they make them stay
naked for a longer period of time than is reasonable for them
to serve the purposes of searching the apartment and for
officer safety, then it becomes a strip search.  That's
essentially what I am saying.

But I understand you take issue to the extent you've
indicated, and that is preserved.

MR. ZELMAN:  Thank you, your Honor.

THE COURT:  Anything else before we start with jury
selection?

M963MIL1

1          MR. PADILLA:  Just a question about jury selection.

2     We are going to put 14 in the box?

3          THE COURT:  Yes.

4          MR. PADILLA:  So all 14 will be in the box.  And then

5     the remainder will be in the audience?

6          THE COURT:  Yes.

7          MR. PADILLA:  Okay.

8          MR. ZELMAN:  I had a question.  I think the defense

9     counsel requested something along lines in his letter about

10    saying something to the jury about if they believe -- they tend

11    to believe somebody who has been alleging a sexual assault or

12    words to that effect.

13         I don't think your Honor ruled on that if I'm not

14    mistaken, but our position is that's unnecessary to address to

15    the jury.

16         THE COURT:  Right.  So, I've tried to capture all the

17    questions that the parties proposed, including that one, in as

18    neutral a way as I can that still gets an affirmative answer if

19    I need to follow up.  Here's how I've worded it.

20         "There may be testimony in this trial about alleged

21    inappropriate touching, including sexually explicit testimony.

22    Is there anything about such testimony that would affect your

23    ability to be fair and impartial?"

24         MR. ZELMAN:  Judge, can we remove "sexually explicit"?

25    I don't think that's -- that's the allegation in this case and

M963MIL1

1    I don't think that's --

2             THE COURT:  I think it is, because there are, well, at

3    least based on the summary judgment record, there could be

4    testimony about specific genital touching.  That's what we need

5    to get at.

6             MR. ZELMAN:  We are not, you know, I think it's

7    important to know we are not really claiming that Ms. Penner

8    did this for her own gratification.  That's not the allegation

9    in the case.  The allegation in the case is that the search is

10   excessive and unreasonable.

11            THE COURT:  That's why I didn't say sexual assault or

12   anything like that. I said testimony that may be sexually

13   explicit, that is talking about genitals, and some people might

14   have a reaction to that which I'll follow up on.

15            MR. ZELMAN:  Can we just say genitals?  Instead of --

16   can we just rephrase it, inappropriate touching of someone's

17   genitals?

18            THE COURT:  Mr. Arko?

19            MR. ARKO:  I'd ask the stipulation be read as your

20   Honor has drafted it with no change be made.  I think our major

21   concern here is whether plaintiff alleges for sexual

22   gratification or not, we need to know if there is someone who

23   maybe was a victim of a prior sexual assault or may have some

24   experience with that.  And if they don't know that going into

25   it is going to shut down and suddenly not be able to be fair

M963MIL1

1    and impartial, not participate in the jury.  If it's not

2    explicitly told to them it is going to involve allegations that

3    are sexual in nature, how can we convey to the jury and make

4    sure we are getting people who are aren't going to be adversely

5    affected by that.

6           I don't think the reason behind why the plaintiffs

7    allege Detective Penner did this makes it non-sexual in any

8    way.

9           THE COURT:  I agree with Mr. Arko.  At least according

10   to the summary judgment record, there is digital penetration.

11   That is sexually explicit and I think I need to flag that for

12   the jury.

13          So I am going to especially keep it as it is.  But I

14   think everything else will be pretty clear and will capture

15   what you all have asked for.  So we'll have questionnaires

16   handed out to them so they can follow along, not to turn in.

17          MR. ZELMAN:  Can you read the way you intend to --

18          THE COURT:  "There may be testimony in this trial

19   about alleged inappropriate touching, including sexually

20   explicit testimony.  Is there anything about such testimony

21   that would affect your ability to be fair and impartial?"

22          MR. ZELMAN:  Okay.  Thank you.

23          THE COURT:  Thanks.  Anything else anybody wanted to

24   address before we bring over the jury?

25          MR. ARKO:  Nothing from defendant, your Honor.

M963MIL1

1        MR. PADILLA:  Nothing from plaintiff.

2        THE COURT:  What's our ETA?

3        We should be getting the members of the venire in

4   about five minutes.  So, I'll explain everything, I'll do an

5   introductory remark.  Thank you for being here.  And then start

6   the questioning with Juror No. 1 who will be the one closest to

7   me.

8        MR. ARKO:  Can we take a bathroom break?

9        THE COURT:  I'm planning to do that.

10        MR. ARKO:  I should also just inform the Court,

11   sitting in the gallery is Rachel Seligman, she is our

12   supervisor.

13        THE COURT:  Ms. Seligman.  It might be easier if you

14   move to that side.

15        We'll resume in about five minutes.

16        (Jury selection off the record)

17        (Adjourned to September 7, 2022, at 9:30 a.m.)

18

19

20

21

22

23

24

25