UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____X
KENYA THOMAS, TYANA MILLER,

                Plaintiff,                Case No.:  17-CV-08593

  -against-

THE CITY OF NEW YORK, et. al.

                Defendants.
_____X

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' RULE 50 and 59 MOTIONS**

**PRELIMINARY STATEMENT**

This matter was tried to a jury on September 6 through September 9 with the Court entering judgement on September 12, 2022 following a jury verdict in favor of defendants. At the conclusion of evidence, plaintiff's counsel made a motion for a directed verdict and the Court heard the motion and reserved decision. At this time, plaintiff would like to address the merits of that motion at the conclusion of evidence and request that the Court grant the plaintiff's motion for a directed verdict on the issues outlined or in the alternative, grant a new trial.

**STANDARD OF REVIEW**

A motion under FED. R. CIV. P. 59 "may invoke the discretion of the court in so far as it is bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantive errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S. Ct. 189, 85 L. Ed. 147 (1940). As compared to the standard for judgment as a matter of law, "[t]he standard for granting a new trial under Rule 59 is less stringent, but still relatively high." *Stern v. Shammas*, No. 12-cv-5210, 2015 U.S. Dist. LEXIS 143194, at *4 (E.D.N.Y. Oct. 21, 2015) (quoting *Starr Indem. & Liab. Co. v. Am. Claims Mgmt.*, 131 F. Supp. 3d 185, 188 (S.D.N.Y. 2015)), *aff'd*, 665 F. App'x 27 (2d Cir. 2016) (Summary Order). Namely, relief under Rule 59 is authorized even in situations where the evidence adduced at the trial was sufficient to support the jury's verdict. *See Nimely v. City of New York*, 414 F.3d 381, 392 (2d Cir. 2005). In addition, in evaluating a motion for a new trial, the Court "need not view the evidence in the light most favorable to the nonmoving party; instead, the court may weigh the evidence — including the credibility of witnesses — independently." *Starr Indem. & Liab. Co.*,

1

131 F. Supp. 3d at 188; *see Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 147 (2d Cir. 2001) ("Freed from the constraints of review that bind a court when deciding whether to grant judgment as a matter of law," in evaluating a motion for a new trial, "the district court [can] examine the evidence through its own eyes").  However, ultimately the question of "[w]hether to grant a new trial pursuant to Rule 59(a) is in the district court's sound discretion," *Clinton v. Brown & Williamson Holdings, Inc.*, No. 05-cv-9907, 2013 U.S. Dist. LEXIS 87204, at *5 (S.D.N.Y. June 20, 2013) (citation omitted), and should not be granted unless, in its independent judgment, the court determines that "'the jury has reached a seriously erroneous result or [its] verdict is a miscarriage of justice,'" *Nimely*, 414 F.3d at 392 (quoting *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004)); *see DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998) ("A court considering a Rule 59 motion for a new trial must bear in mind . . . that the court should only grant such a motion when the jury's verdict is 'egregious'") (quoting *Dunlap-McCuller v. Rise Organization*, 980 F.2d 153, 158 (2d Cir. 1992)).  (*Parker v Bulik*, 2017 US Dist LEXIS 124301, at *41-43 [EDNY Aug. 5, 2017, No. 11-cv-5412(ADS)(SIL)]) "

## **RELEVANT TRIAL HISTORY**

In this matter, plaintiffs, both black females in their 20's, were residing at 60 Moore Street, Brooklyn, New York on February 2, 2017.  Plaintiff Kenya Thomas lived in the apartment since birth however plaintiff Tyana Miller was visiting her boyfriend who resided in the apartment, Mr. Ira Thomas. Also residing in the apartment on that day were at least two of Kenya's older sisters.  On February 2, 2017, at approximately 9 AM, Emergency Service Officers ("ESU team"), wearing body armor and using a type of battering ram, broke the front door of the apartment and immediately entered the apartment of the plaintiffs who had no idea

2

what was happening. The occupants were immediately roused. ESU team members "secured" the apartment and made sure it was safe for the NYPD search team to enter the apartment. They did this by making sure there were no weapons available and cuffed the plaintiffs. By the time the actual search team entered, the apartment was fully secured and defendants found both plaintiffs in handcuffs. (Trial transcript, Penner: p. 142-144, 149).

      Defendant Penner testified that she was not told anything specific as to why the plaintiffs needed to be searched after having been cuffed. Her testimony is clear that she had no specific concern that the plaintiffs were concealing evidence. Although she was reluctant to admit it she did describe the reason for her search as follows:

    Q. Why did you search Kenya Thomas?

    MR. ARKO: Objection.

    THE COURT: Overruled.

    A. She was in custody. They needed a female to search any females that are in custody, and that is what I did. (Exhibit A, Trial transcript, p. 153).

At deposition, defendant Penner was more blunt about her reasons for searching the plaintiffs:

    Q: And again, you were not given any indication that there was any particular reason that these women might have contraband on them before you were searching them, other than the fact that they were detained, right?

    A. No, no . (Exhibit B, Penner Deposition, p. 69)

Therefore, it is undisputed in this case that defendants had no reasonable suspicion that either of the plaintiffs posed any harm to the defendant officers due to their status as being cuffed and that the officers, including Penner, had no specific information that either the plaintiff possessed any contraband. And in fact, the testimony was clear that neither did possess any contraband.

Nonetheless, defendant Penner admits to performing a search which she labeled at trial as a "pat down" but in fact was more invasive than a pat down due to the fact that the plaintiffs were not wearing any or limited clothing. Penner described her search as follows on redirect:

> Q. You described the manner in which you searched Kenya Thomas and the other woman who you described as wearing basketball shorts; right?
>
> A. In the second bedroom?
>
> Q. Yes.
>
> A. Yes.
>
> Q. Okay. And you described the way in which you touched their legs; correct?
>
> A. Yes.
>
> Q. Could you do that again? Where I was sitting, I really couldn't see what you were doing and it was a physical kind of –
>
> A. Sure. So she was wearing basketball shorts, so they were to her knee. So I started, just out of habit, from the ankle. So I went -- you slide your hands up and you squeeze a little bit, slide, making sure there is no protrusions.
>
> Q. So your hands are near the genital area when you're doing that; right?
>
> A. When your hand slides up to the apex of where the crotch area and the upper area starts, like my backhand would be towards the crotch area, yes. (Penner Redirect: Trial transcript, p. 185-186)

Penner also admitted at trial that she could not recall if she was wearing gloves while performing the searches. (Trial Transcript, p. 197)

The facts as presented at trial are mostly undisputed. There was a search warrant signed by a Judge. Plaintiffs were not listed on the warrant but a male was and the warrant specifically

4

allowed the officers to search the male listed on the warrant. (See Exhibit C, Search Warrant) When officer Penner approached plaintiffs the plaintiffs were already cuffed, i.e there is no reasonable concern for officer safety at that point.   Plaintiff Miller testified that she was completely naked standing in the room waiting, while Officer Penner testified that Miller was naked from the waist down only and had a t-shirt on and was covered initially by a blanket. Critically, and this point was raised at the conclusion of evidence by plaintiff's counsel, there is no dispute in this case that Officer Penner testified that she removed the blanket covering Miller's naked body from the waist down for "a few seconds" in order to assist her to put on leggings.  Moreover, defendant Penner admits that there were men in the room when she caused Miller to be exposed and made no effort to exclude the men from the room prior to exposing Miller.   Penner testified on this point as follows:

> Q. At the point where she's putting on the black leggings, is she covered with the blanket?
>
> A. So, the way I did it was, it's like you would put on a child. You would scrunch up one, have her put her foot through, scrunch up the other one, go up, and obviously because she was rear cuffed, she could not remove the sheet. So I removed the sheet, I had her stand up, and I put the pants to her waist. (Trial Transcript, Penner, p.143).

It was admitted by Penner that when she did that both Ira Thomas and Andrew Kamna were in the room and could view the now exposed Miller. (Trial transcript, Penner:  p. 156).  Penner admitted she made no effort to search Miller in a private area explaining "I was focused on the task at hand."  (Trial Transcript, Penner, p. 144)  Similarly, Penner admitted that men could view her search of Thomas, however, there is no evidence to support the fact that Penner caused

5

Thomas to be naked and visible to men as she did to Miller.  Penner did admit however, that it was possible for men to view her searching Thomas as well.  (Trial transcript, Penner, p.155)

In sum, this matter is ripe for a legal disposition as the facts are minimally disputed with Miller alleging that Penner penetrated her vagina with her finger and Thomas alleging that Penner felt her vagina and./or clitoris.  Penner adamantly denied those allegations but admitted that her hand was "next to" the genital areas of the plaintiffs.  (See Trial Transcript, Penner, 185-186).  Moreover, there was no reasonable suspicion to search the cuffed plaintiffs, there was no contraband located in the entire apartment, no one was arrested at the scene and the officers simply had nothing other than the warrant to base their searches on.  The warrant itself is silent as to searching occupants of the apartment.

## ARGUMENT

I. **MILLER IS ENTITLED TO A DIRECTED VERDICT BECAUSE PENNER ADMITS TO CAUSING MILLER TO BECOME NAKED AND VISIBLE TO MEN IN THE IMMEDIATE VICINITY**

As discussed above, PENNER admits that she removed MILLER's blanket from her naked body and caused MILLER to be exposed to men in the apartment.  Moreover, PENNER admits that she made no effort to prevent exposing MILLER to the men in the apartment.  This is both violative of plaintiff's right to avoid being forced to conceal her exposed body from the view of male officers.  See, *Gonzalez v City of NY*, 2006 US Dist LEXIS 103031, at *42-43 [EDNY Jan. 3, 2006, No. 01 CV 5584 (JG)])  ("Denise Brown's right to privacy in her body's exposure during the defendants' execution of the search warrant was clearly established at the time of the instrusion. See Poe, 282 F.3d at 136, 138-139**21** ; *see also id.* ("We cannot conceive of a more basic subject of privacy than the naked body. The desire to shield one's unclothed

6

figure from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity.") (quoting *York v. Story*, 324 F.2d 450, 455 (1963)).  While neither the Supreme Court nor the Second Circuit has decided a case with facts identical to those presented here, the Second Circuit's analysis in *Poe v. Leonard* clearly established the right, during the execution of a search warrant, to cover one's naked body upon request, where there is clothing nearby and such actions would not compromise officer safety or other legitimate governmental concerns.")

Here, defendant PENNER admits to causing MILLER's naked body to be exposed to men when it was previously not.   Although the time it was exposed, according to PENNER was "a few seconds" that fact should not be dispositive.  In *Gonzalez* and the cases cited by Judge Gleeson in *Gonzalez*, the plaintiff was naked prior to the entry of the officers.  Here, PENNER admits she caused MILLER's naked body to be exposed.  Even if that time was brief, still, there was no need, i.e no governmental interest for causing the exposure which the *Gonzalez* court and others cite as the principal justification for finding that no invasion of privacy or unreasonable search exists.  The Court in *Gonzalez* found:

> Here, the record does not reveal a single reason why the officers could not have handed Denise a robe, or some other item to cover her body, at any time during the hour she alleges she was detained in her bedroom. At oral argument, defense counsel offered the argument that the officers could not hand her a robe because "[t]here might be a gun underneath the blankets, [or] . . . in her wingspan that she can reach for," and that she would be less able to reach for a gun if she was naked than if she were not. (Tr. Apr. 16, 2004 at 17.) This argument is frivolous. Moreover, any such safety rationale would be seriously undermined by the fact that the officers were not concerned enough by Denise Brown to handcuff her.(*Gonzalez v City of NY*, 2006 US Dist LEXIS 103031, at *39 [EDNY Jan. 3, 2006, No. 01 CV 5584 (JG)])

Similarly, there was no reason offered at trial as to why the women were not searched in a private setting.   Courts following *Gonazalez,* with facts very similar to the within matter, have also hinged their determination on whether there existed a legitimate law enforcement reason to

7

allow the exposure of a plaintiff. See (*Scott v City of NY*, 2020 US Dist LEXIS 6313, at *32-33 [EDNY Jan. 14, 2020, No. 16-CV-834 (NGG) (ST)]) ("also., e.g., Daniels v. City of New York, No. 16-cv-190 (PKC), 2018 U.S. Dist. LEXIS 147439, 2018 WL 4119191, at *8-9 (E.D.N.Y. Aug. 29, 2018) (holding that right to privacy in one's unclothed body is clearly established and denying qualified immunity where officers made plaintiff stand in the nude for several hours). This right, however, is not unlimited, and police may require civilians to stand in the nude when doing so is necessary to advance a legitimate law enforcement interest. See L.A. County v. Rettele, 550 U.S. 609, 614, 127 S. Ct. 1989, 167 L. Ed. 2d 974 (2007) (where appellees were nude in bed when officers entered to execute search warrant, officers did not violate appellees' constitutional rights by requiring them to briefly stand nude while officers searched bed for weapons and secured room).

There are important distinctions here as to why defendant PENNER violated plaintiff MILLER's right to be exposed to men in the apartment. First, the purpose of having MILLER stand up naked, according to PENNER, was to make sure she was dressed, i.e not a legitimate law enforcement reason. PENNER never mentioned the need to search the bed or the blankets, rather her sole explanation for causing MILLER to become nude was to make sure she would be clothed. (Trial Transcript, Penner, p. 156, 170-171). While it is also true that MILLER testified, unimpeached that she requested permission to put clothes on and was told that she needed to wait for the female officer to arrive (See Trial transcript, p. 92) the Court need not rely on the plaintiff's testimony to find that a constitutional violation occurred. As argued above, whether PENNER was allowed to cause MILLER to stand exposed, for any period of time, hinged upon whether a legitimate law enforcement need existed at the time. Here, there was no dispute at trial, MILLER was cuffed when PENNER approached her, PENNER was not attempting to

8

search anyone but MILLER when she caused her to stand exposed, PENNER had no reasonable suspicion that MILLER was concealing anything, no contraband was found in the apartment and no person was charged with a crime.  Under these circumstances, the brevity of the exposure to the men in the apartment is not the controlling factor, it is the need for it, and here PENNER admits that she caused MILLER to be exposed solely for the purpose of making sure she was clothed.  Clearly, there is no law enforcement privilege in exposing women to men so that the women are clothed.  Nor does PENNER offer any reasonable justification for this forced exposure, why she did not ask the men to leave the room or at least permit MILLER to be covered while she stood up.  While the forced exposure incident is brief in duration, that brevity should not be a basis to apply qualified immunity as it was unnecessary and not related to any legitimate governmental interest.

II.     **WHERE THERE IS NO REASONABLE SUSPICION TO SEARCH, THE SEARCHES ADMITTEDLY PERFORMED BY PENNER WERE EXCESSIVE AND UNREASONABLE AS A MATTER OF LAW**

At trial, it was admitted that defendants, specifically PENNER, had no reasonable suspicion to perform a search on either of the plaintiffs.  Moreover, as argued above, no contraband was found at the apartment, plaintiffs were not listed on the warrant and no one was arrested.  Under these circumstances, the governments permission to perform the type of search performed on the cuffed plaintiffs is curtailed.  "See, *Sims v Farrelly*, 2013 US Dist LEXIS 110359, at *23-24 [SDNY Aug. 2, 2013])  ("For more than twenty years, the Second Circuit has consistently and repeatedly held that a misdemeanor arrestee may not be strip searched in the absence of "an individualized 'reasonable suspicion that a misdemeanor arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the

arrestee, and/or the circumstances of the arrest.' ("*Hartline v. Gallo*, 546 F.3d 95, 100 (2d Cir. 2008) (quoting *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986)); *see also Kelsey v. Cnty. of Schoharie*, 567 F.3d 54, 62 (2d Cir. 2009) (reiterating the Circuit's "long-standing precedent covering strip searches for those arrested for misdemeanors" and collecting cases) (citations omitted); *N.G. v. Connecticut*, 382 F.3d 225, 232 (2d Cir. 2004) (noting that "all the circuits to have considered this issue have reached the same conclusion"). "To establish reasonable suspicion, officers must point to specific objective facts and rational inferences that they are entitled to draw from those facts in light of their experience." *Hartline*, 546 F.3d at 100 (quoting *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997)). "The standard requires individualized suspicion, specifically directed to the person who is targeted for the strip search." *Id*.

    Even if a warrant exists to search a premises, that does not permit officers to search occupants who simply happen to be in the vicinity.  (*Brown v City of Utica*, 854 F Supp 2d 255, 261 [NDNY 2012])  ("When executing a valid search warrant, law enforcement officers have a "general authority to detain persons and make limited security searches." Rivera v. United States, 928 F.2d 592, 606 (2d Cir. 1991). "[H]owever, there must be probable cause, or at least some degree of particularized suspicion, to justify further searches or seizures of individuals who are neither named in the warrant nor arrested as a consequence of the search." Id.; see also United States v. Bush, No. 5:09-CR-3, 2009 U.S. Dist. LEXIS 95440, 2009 WL 3334518, at *6 (N.D.N.Y. Oct. 14, 2009) (Suddaby, J.) (suggesting "independent probable cause" is required for officers to search occupants of a house who are not specifically listed in the search warrant). Additionally, "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that

10

person." Ybarra v. Illinois, 444 U.S. 85, 86, 100 S. Ct. 338, 339, 62 L. Ed. 2d 238 (1979).

In this case, it is obvious that plaintiffs were caused to endure searches more invasive than a pat down search as both plaintiffs were admittedly already handcuffed when PENNER approached them. See *Mejia v City of NY*, 119 F Supp 2d 232, 286 [EDNY 2000]  ("Given that there is evidence that Sergeant McNicholas lacked an objectively reasonable belief that Mrs. Mejia had committed any drug-related crime, such a search could not be justified on a reasonable suspicion that she might be carrying additional contraband. Nor would it appear that Sergeant McNicholas ordered the search out of a reasonable suspicion that Mrs. Mejia might be carrying a weapon, since Mrs. Mejia had already been pat-down searched at the arrest scene and Sergeant McNicholas had previously removed Mrs. Mejia's handcuffs when he searched the Mejias' office, (McNicholas Dep. at 76 (explaining that he did so, in part, because "I had no reason to believe there would be any trouble with [the garage employees], *especially with her*" (emphasis added)). Sergeant McNicholas's act of ordering what, therefore, must be assumed was an unjustified strip search further contributes to the extreme and outrageous character of his overall alleged course of conduct.")

In this case, while it was not disputed that the plaintiffs were cuffed at all times during their interaction with defendant PENNER, it was also obvious in this case that given the lack of attire of the plaintiffs when PENNER approached them, there is no purpose in performing a simple pat down search.  A pat down necessarily involves clothes and while MILLER was admittedly naked from the waist down, THOMAS was also only wearing a gown according to the undisputed testimony.   Therefore, given that the plaintiffs were cuffed, the only purpose PENNER could have had in searching the plaintiffs was to search for contraband secreted

11

someplace on their bodies.  While PENNER adamantly denies searching the plaintiff's genital areas in an invasive fashion, she does admit to briefly touching "near" the plaintiffs' genital area. (See Trial Transcript, Penner, p. 186).   The type of search described by PENNER, which she admittedly had access to view the naked bodies of the plaintiffs should be categorized as a visual body cavity search and/or a strip search rather than a pat down search.   Because the plaintiffs were cuffed and because there was no legitimate fear of officer safety during the searches of the plaintiffs, the lack of reasonable suspicion caused the additional searches of the naked and near naked plaintiffs to be unconstitutional.  See, *Flores v City of Mount Vernon*, 41 F Supp 2d 439, 444-445 [SDNY 1999])

## **CONCLUSION**

In sum and for the reasons explained above, plaintiffs request a directed verdict  as the searches performed by defendant PENNER were excessive and unreasonable as a matter of law under the circumstances.   In the alternative, plaintiff requests a new trial.

DATED: Brooklyn, New York
         October 7, 2022

Respectfully Submitted,

**LAW OFFICE OF DAVID A. ZELMAN**

/S
_____

By: **David A. Zelman, Esq.**
Attorney for Plaintiffs
709 Eastern Parkway
Brooklyn, New York 11213
(718) 604-3072

CC: Chris Arko, Esq. (Via ECF)